# HOMER JAMES SMITH *v.* STATE OF MARYLAND

[No. 1408, September Term, 1977.]

*Decided January 26, 1979.*

The cause was argued before MOYLAN, MELVIN and COUCH, JJ.

*Alfred L. Scanlan, Jr., Assigned Public Defender,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and

*Donaldson C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

This appeal turns upon a close examination of a single word — the past participle "premeditated." It is a term of art which once had (and may or may not still have) legal significance. We will ask three independent questions about that significance, a negative answer to any one of which will be fatal to the appellant's present claim:

(1) *Is the character of a murderous intent as "premeditated" a necessary element of the crime itself or is it simply, for purposes of grading punishment, an aggravating factor of a crime otherwise defined?;*

(2) *Does the participle "premeditated" carry any unique, non-redundant content not conveyed, by necessary implication, by either of its statutory adjectival companions "wilful" and "deliberate" or by the two of them combined?;*

(3) *Does "premeditated," standing alone, still convey any meaning at all or has it gone the way of its common law ancestor "aforethought" and been drained of all present content?*

The appellant, Homer James Smith, was convicted by a Cecil County jury, presided over by Judge H. Kenneth Mackey, of murder in the first degree. He attacks both the sufficiency of the indictment and the sufficiency of the evidence. The latter contention will not long detain us.

## I.

### *The Legal Sufficiency of the Evidence to Prove First-Degree Murder*

At approximately 11 p.m. on February 25, 1977, Thomas Cifaldo was fatally struck by shotgun pellets fired from the

gun then held by the appellant. Although there was conflicting testimony as to the circumstances leading up to the shooting, that version most favorable to the State was enough to support the theory that the appellant had been with the victim, theretofore his friend, in the Royal Bar; that the appellant was perturbed by a discussion about a divorce between him and his 'wife; that the victim had kidded the appellant about being so ugly that his wife could not be blamed for divorcing him; that the appellant had made obscene comments to the deceased; that the appellant left the bar and went to a nearby home where he procured the shotgun; and that the appellant shot the victim immediately upon his return to the bar. It was within the jury's prerogative to disbelieve the appellant's story that the gun had gone off accidentally.

From all of the above, the jury could legitimately have concluded that the appellant was insulted by the victim an hour or two before the ultimate killing, that the grievance festered over the course of that hour or two, that the appellant went and procured the murder weapon with the fully formed design to kill his tormentor and that he subsequently executed his murderous purpose "wilfully," "deliberately" and with "premeditation."

Such an amplitude of evidence and of permitted inferences therefrom may have been necessary to persuade the jury beyond a reasonable doubt that the appellant was guilty of murder in the first degree. It was a "gilding of the lily," however, when we apply the very different measurement called legal sufficiency. Here we are concerned with that rock-bottom minimum of evidence necessary to establish a mere *prima facie* case — to enable the State to avoid the peril of a judgment of acquittal — to permit the evidence to go to the jury for such weight as they, in their unfettered prerogative, may choose to give it. We are concerned not with how much evidence *will* persuade the jury but with how much evidence, as a matter of law, *could* persuade the jury. We ask only whether there is some competent evidence which could establish each element that must be proved. *Williams v. State,*

5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331.

To establish murder it is initially necessary to establish homicide — the killing of one human being by another. The evidence was not disputed that Thomas Cifaldo died on February 25, 1977, as a direct result of being blasted with a shotgun. It was not disputed that the appellant was the homicidal agent who was holding the shotgun at the time it went off.

To raise the homicide to the level of felonious homicide (murder or manslaughter) it is necessary to establish that the defendant intentionally did the act that resulted in the death and that he did so without justification or excuse. With respect to non-justification, the State in this case was entitled to rely upon the Thayer-Wigmore presumption that the homicide was not justified. The risk is upon the defendant of not producing legally sufficient evidence of justification to dissipate this presumption and to generate a genuine jury issue in this regard (unless, of course, the State's evidence itself accomplishes such "bubble-bursting" dissipation). *Mullaney v. Wilbur,* 421 U. S. 684, 701-704, 95 S. Ct. 1881, 44 L.Ed.2d 508, 521-522 (1975); *State v. Evans,* 278 Md. 197, 207-208, 362 A. 2d 629, 635-636 (1976); *Evans v. State,* 28 Md. App. 640, 722-727, 730, 349 A. 2d 300, 350-352, 354 (1975). In this case, this hazard of not producing some evidence proved fatal and non-justification was therefore established as a matter of law. This was also true with respect to all varieties of excusable homicide, save only that of accident (or as the older texts referred to it, misadventure). The appellant himself testified that the shotgun went off accidentally. This dissipated the presumption of non-excuse of this particular variety and imposed upon the State the burden of proving non-accident beyond a reasonable doubt. The jury, however, was entitled to disbelieve such defense testimony. From the killing itself and from the disbelief of the evidence of accident, the jury was permitted to infer that the killing was non-accidental and, thereby, non-excusable. *Gilbert v. State,* 36 Md. App. 196, 373 A. 2d 311 (1977).

When it comes to the intentional quality of the homicidal

act, we are dealing with an affirmative element and not a negative one. The State here does not enjoy the benefit of a Thayer-Wigmore presumption but must prove the intent as it must prove all other elements of the crime. There are four varieties of intent which may establish felonious homicide — 1) the specific intent to kill, 2) the specific intent to inflict grievous bodily harm, 3) the general intent to do the death-producing act in the course of the commission, or attempted commission, of a felony, (This intent applies to murder alone. Its mitigated, manslaughter-establishing equivalent is the general intent to do the death-producing act in the course of the commission, or attempted commission, of a misdemeanor or other unlawful act.) and 4) the general intent to do a life-endangering act with reckless and wanton disregard of the consequences. (This latter intent applies to murder alone. Its mitigated, manslaughter-establishing equivalent is the general intent to do the death-producing act in a grossly, criminally negligent manner.)

In this particular case, the variety of intent we are dealing with is the specific intent to kill. In this regard, we have evidence that the appellant fired a sawed-off shotgun at point-blank range into the chest of the victim. This represents, quite clearly, the directing of a dangerous and deadly weapon at a vital part of the human anatomy. It is well established that this gives rise to a permitted inference of the intent to kill. As we said in *Evans v. State,* at 28 Md. App. 640, 704, 349 A. 2d 339-340:

> "The only inference of any significance in our homicide law is the permitted inference of an intent to kill or of an intent to do grievous bodily harm from the directing of a deadly weapon at a vital part of the human anatomy or from some similar use of deadly force. The earlier case law sometimes spoke of the use of a deadly weapon as giving rise to a 'presumption of malice.' In *Lindsay v. State, supra,* however, Chief Judge Orth stole a march on *Mullaney v. Wilbur* and strove mightily to refine the appellate vocabulary of Maryland and to bring it into the 20th century. He meticulously explained that we

> do not 'presume' anything from the use of deadly force; we are only permitted (but not required) to draw inferences from such use of deadly force. He further pointed out that this permitted inference of fact passes full constitutional muster under *Leary v. United States, supra.* We reaffirm and add that it thereby also passes constitutional muster according to *Mullaney v. Wilbur* and *Winship.*"

See also *Lindsay v. State,* 8 Md. App. 100, 104, 105-109, 258 A. 2d 760 (1969); *Thompson v. State,* 38 Md. App. 499, 504, 381 A. 2d 704, 706-707 (1978).

Thus, from 1) the evidence of homicide, 2) the evidence of the appellant's homicidal agency, 3) the presumption of non-justification, 4) the presumption of non-excuse other than accident, 5) the permitted inference of non-accident and 6) the permitted inference of the intent to kill, the evidence was legally sufficient to establish felonious homicide. To pin such felonious homicide at the murder level rather than the manslaughter level, it was necessary to establish that the felonious homicide was not mitigated. *Bartram v. State,* 33 Md. App. 115, 176-177 n. 7, 364 A. 2d 1119, 1154 n. 7 (1976); *Whitehead v. State,* 9 Md. App. 7, 10-11, 262 A. 2d 316 (1970). In this regard, the State again had the benefit of a Thayer-Wigmore presumption. "Absent some legally sufficient indication to the contrary, the homicide will be presumed to be . . . not mitigated." *Gilbert v. State, supra,* at 36 Md. App. 200. There was no legally sufficient evidence in this case to dissipate the presumption of non-mitigation and the evidence was, therefore, legally sufficient to establish murder.

Maryland statutes spell out a number of aggravating circumstances which can raise murder generally into murder in the first degree. They are 1) the perpetration, or attempted perpetration, of a number of specific felonies (Art. 27, §§ 408, 409 and 410), 2) the use of poison (§ 407), 3) the circumstance of ambush or "lying in wait" (§ 407), and 4) any kind of wilful, deliberate and premeditated killing (§ 407). In this case, we are concerned only with the latter form of aggravation.

Maryland has defined "wilful" as "[possessing] a specific purpose and design to kill." *Chisley v. State,* 202 Md. 87, 106, 95 A. 2d 577. This is, *ipso facto,* the specific intent to kill and, therefore, when we are dealing with this particular murderous intent rather than the other three murderous intents, a *prima facie* case of the specific intent to kill is a *prima facie* case of wilfulness. The Maryland law goes on, represented by *Chisley v. State, supra,* at 202 Md. 106, to point out that "to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate." From the specific intent to kill, there is at least a permissible inference that there was a full and conscious knowledge of the purpose to kill (if, indeed, this represents anything more than saying the same thing in two different ways). Furthermore, from the legally sufficient evidence of deliberation, it follows, by permissible inference if not ineluctably, that there was "time enough to be deliberate" — to wit, "premeditation." When, therefore, there is legally sufficient evidence to establish the specific intent to kill, there is legally sufficient evidence to establish that such specifically entertained and executed intent was wilful, deliberate and premeditated. Ergo, the evidence in this case was legally sufficient to permit the case to go to the jury on the issue of murder in the first degree.

## II.

### The Legal Sufficiency of the Indictment to Charge First-Degree Murder

The indictment in this case charged that the appellant at a certain place on a certain day:

> "... feloniously, and wilfully and of deliberate malice aforethought, did kill and murder Thomas Edward Cifaldo. ..."

The appellant claims that the indictment failed to charge murder in the first degree because it failed to allege that the

killing was "premeditated." It is agreed by all parties that the State's theory of first-degree murder in this case is based upon that part of § 407 which provides that "[a]ll murder which shall be perpetrated ... by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

## A. THE STATUTORY FORM OF A MURDER INDICTMENT

The appellant seeks initial solace in § 616 (a) which provides:

> "(a) *Where death penalty not sought.* — Except as provided in subsection (b), in any indictment for murder or manslaughter, or for being an accessory thereto, it shall not be necessary to set forth the manner or means of death. It shall be sufficient to use a formula substantially to the following effect: 'That A. B., on the . . . . . . . day of . . . . . . . . . nineteen hundred and . . . . . . . . , at the county aforesaid, feloniously (wilfully and of deliberately premeditated malice aforethought) did kill (and murder) C. D. Against the peace, government and dignity of the State."

Even were we confined to § 616 (a), which we are not, we would perceive no fatal shortcoming in the charging document. When Chapter 138 of the Acts of 1809 first divided murder into degrees in Maryland, four already venerable varieties of capital murder at the common law became, simultaneously, charter members of the Maryland Statutory First-Degree Murder Club. They were:

1. Murder by ambush or "lying in wait" (the oldest of the dread forms of murder at the common law);
2. Murder by means of poisoning;
3. Murder consisting of wilful, deliberate and premeditated murder; and

4. Murders committed in the perpetration, or attempted perpetration, of certain of the more significant felonies.

There is no "pecking order" within the class of first-degree murder. Each member of the class is autonomous and each is distinct. To prove one of the statutory felony murders, for instance, "there is no need to prove wilfulness, deliberation and premeditation as would be required by § 407." *Newton v. State,* 280 Md. 260, 269, 373 A. 2d 262. Nor is wilfulness, deliberation and premeditation a necessary element of murder by poisoning. Even murder by "lying in wait" presumably would not require the wilful and deliberate design to kill but could attend a specific intent to inflict grievous bodily harm or the perpetration of any felony (even those not spelled out in §§ 408, 409 and 410) or the doing of a wantonly reckless, life-endangering act. It is no more necessary to plead "wilfulness, deliberation and premeditation" in order to prove a non-premeditated murder by poisoning than it is necessary to plead "murder by poisoning" in order to prove a premeditated but non-poisonous killing. When it is appropriate to prove aggravating circumstances A, B, C or D, aggravating circumstance A does not enjoy any special status or favored treatment for pleading purposes.

The decision of the Court of Appeals in *Wood v. State,* 191 Md. 658, 62 A. 2d 576 (1948), construing this section, does not give the appellant the sustenance he seeks to extract from it. This failure to give aid and comfort by requiring a rigidly precise and technical pleading is made manifest by the case in two different regards, the first of which we shall now consider. Wood was convicted of the first-degree murder of a policeman under circumstances that permitted either the theory of premeditation or the theory of robbery-murder to serve as the aggravating circumstance raising the murder to the first degree. The indictment in the *Wood* case, however, charged only premeditated murder. Wood sought to foreclose the felony-murder theory "because the indictment charges only premeditated murder, as distinguished from murder committed in the perpetration of a robbery." 191 Md. at 665.

In holding that the indictment as worded could serve as an adequate pleading for a felony-murder conviction, Judge Henderson restated the defense thesis and rejected it at 191 Md. 666:

> "The appellant contends that since the indictment charged premeditated murder under section 665 of Art. 27, the charge would not include or permit proof of murder in the perpetration of a robbery under section 478. We think the contention is unsound."

An even more recent indication that a rigidly technical pleading is not required came in *State v. Williamson,* 282 Md. 100, 382 A. 2d 588 (1978), wherein the Court of Appeals held that a defendant may be convicted as an accessory before the fact to murder even where the technical wording of the indictment seems to charge guilt literally as a principal. And see *State v. Ward,* 284 Md. 189, 396 A. 2d 1041 (1978).

All of this underlines the considered use by § 616 (a) of the adverb "substantially." Before setting out its suggested formula, it points out *not* that it shall be sufficient to use a formula *precisely* to the following effect but rather that "[i]t shall be sufficient to use a formula *substantially* to the following effect: . . ." (Emphasis supplied) The indictment now in issue certainly represents a formula *substantially* to the effect of that suggested by § 616 (a).

If, using *Wood v. State* as the bench mark, there is substantial compliance for pleading purposes when 1) the State alleges premeditated murder with no mention of an underlying felony and 2) then proves felony-murder which need not be premeditated but which does require an underlying felony, the indictment now before us is preeminently far closer to and in more substantial agreement with the statutory, shorthand formula. Albeit the word "premeditated" is not explicitly set forth, the indictment does allege that the appellant "did kill and murder" and that he did so "feloniously" and that he did so "wilfully" and that he acted "of . . . malice" and that the malice was "deliberate." If all of these allegations were not enough to demonstrate substantial compliance with the formula, the clincher is the

further allegation that the malice was "malice *afore-thought.*"

Over its course, the common law has used three past participles — 1) the French "prepense," 2) the Saxon "aforethought," and 3) the Latin derivative "premeditated" — to allege precisely the same thing.[1] The prefixes "pre," "afore" and "pre" all refer to the time sequence of something happening "beforehand." The root verb forms "pense," "thought" and "meditated" all denote the act of thinking. As was pointed out in Moreland, *Law of Homicide* (1952), at 200:

> "The most striking thing about this statute [the Pennsylvania Act of 1794 from which the Maryland Act of 1809 was taken] is the substitution of the word 'premeditated' for the common law word 'aforethought.' In all other respects the statute is the equivalent of a codification of the common law. And yet, in a dictionary sense the word 'premeditated' is no more than the equivalent of 'aforethought,' so far as the factor of pre-design is concerned, — which is the gist of the first degree of murder. This substitution of a new word was made necessary by the fact that 'aforethought' has been drained of its natural meaning when used in common law murder and has become an empty word. So the law makers substituted another word which in its natural sense has exactly the same connotation of pre-design. They, in effect, resurrected the original meaning of 'aforethought'."

In the strict dictionary sense, "aforethought" and "premeditated" convey precisely the same meaning. To the charge that the word "aforethought" has been drained of its original meaning over the centuries, the response can be made that so has "premeditated." Both, as will be more fully examined hereinafter, have been reduced to ritualistic incantations for pleading purposes. As an incantation, the Saxon version is just as talismanic as the Latin.

---

1. Perkins, *A Re-examination of Malice Aforethought,* 43 Yale L.J. 537 (1934).

*Wood v. State* is fatal to the appellant's claim in yet a second respect. It points out that a murder indictment need not be drawn with § 616 in mind. Judge Henderson points out, at 191 Md. 667, that § 616 "does not create any new crime, but merely furnishes a shortened statutory form which may, *but need not,* be used in lieu of the common law forms." (Emphasis supplied) In pointing out that particularization of the murder theory was not required by a murder indictment at the common law and that no such particularization is now required since we have broken murder into degrees, he went on, at 191 Md. 667, "Since the common law forms are still permissible the statutory form could hardly be construed to impose additional requirements in this respect." *Wood v. State* is further instructive as to what is required for a murder indictment to be adequate according to "the common law forms." He pointed out, at 191 Md. 666:

> "At common law, as Blackstone states, (4 *Commentaries,* p. 197), the word murder had the well-defined meaning of a killing with 'malice aforethought'. Malice could be express or implied from conduct as where 'one intends to do another felony, and undesignedly kills a man, this is also murder.' He also states (4 *Commentaries,* p. 307) that the words 'murder' and 'feloniously' must be used in an indictment."

The indictment now under review complied with the common law requirements by using, *inter alia,* the adverb "feloniously" [2] and the verb "murder." It was sufficient to charge murder at the common law. Is it still sufficient to charge murder in the first degree in Maryland? This brings us to the first of the three questions we will ask about the significance of the word "premeditated."

---

2. Even the adverbial requirement — alleging that the act was done "feloniously" or even "unlawfully" — passed into history on July 1, 1977. Maryland Rule 711 (d).

## B. IS THE CHARACTER OF A MURDEROUS INTENT AS "PREMEDITATED" A NECESSARY ELEMENT OF THE CRIME ITSELF OR IS IT SIMPLY, FOR PURPOSES OF GRADING PUNISHMENT, AN AGGRAVATING FACTOR OF A CRIME OTHERWISE DEFINED?

Murder at the common law was a capital offense and, as such, it came into Maryland with the first settlement. Over the course of the common law, efforts were made periodically to ameliorate the harshness of the death penalty. The ameliorating device was to allow certain less atrocious murders to be "clergyable." If a convicted felon received the benefit of clergy, he received a sanction less severe than the death penalty. A series of Tudor statutes between 1496 and 1547 provided that all murders carried out with "malice prepense" or "malice aforethought" would be non-clergyable (to wit, capital) and that other murders would be clergyable (to wit, non-capital). As part of the general common law tradition, murder was treated in this fashion in the proprietary colony of Maryland and later in the free state of Maryland. By the middle of the 17th Century, however, the notion of "prepense" or "aforethought" had been so eroded that, in effect, all murder was non-clergyable and, therefore, capital.[3]

In the last decades of the 18th Century, the reforming influence of the French Enlightenment, as manifested particularly in the writings of Montesquieu, Voltaire and Beccaria, made itself felt in this country. Under the leadership of the Whig Society in Philadelphia, the first American reform statute, cutting back on capital punishment in many cases of murder, was the Pennsylvania Act of 1794. This was the first American statute to divide murder into degrees, leaving capital punishment intact as the appropriate sentence for murder in the first degree but providing for a

---

**3.** See generally Moreland, *The Law of Homicide* (1952); Green, *The Jury and the English Law of Homicide, 1200-1600,* 74 Mich. L. Rev. 413 (1976); Kaye, *The Early History of Murder and Manslaughter,* 83 Law. Q. Rev. 365, 569 (1967); Michael & Wechsler, *A Rationale of the Law of Homicide,* 37 Colum. L. Rev. 701, 1261 (1937).

lesser sentence for murder in the second degree.[4] As of 1953, 37 states and the District of Columbia had followed the lead of Pennsylvania and had divided murder into degrees, most of them following the Pennsylvania statute of 1794 verbatim.[5] Hochheimer, *Crimes and Criminal Procedure* (2d Ed. 1904), § 347; Perkins, *Criminal Law* (2d Ed. 1969), pp. 88-89; *Chisley v. State,* 202 Md. 87, 95-96, 95 A. 2d 577 (1953); Moreland, *The Law of Homicide* (1952), p. 200.

Maryland was one of the early states to follow Pennsylvania's lead. We did so with § III of Chapter 138 of the Acts of 1809.[6] The reliance of Maryland upon Pennsylvania is apparent when the two acts are placed side by side. But for the fact that Maryland was more sanguinary in dealing with barn burners, tobacco-house burners, sodomites and maimers, there is no substantial difference between the two statutes.

---

4. Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U. of Pa. L. Rev. 759 (1949). (Hereinafter Keedy)

5. Brenner, *The Impulsive Murder and the Degree Device,* 22 Fordham L. Rev. 274 (1953). (Hereinafter Brenner)

"The Pennsylvania statute, the first to create degrees of murder, was enacted at a time when Anglo-American law punished by death a staggering number of crimes, and at a time when public sentiment was exerting pressure to mitigate in this respect the rigor of the common law." *Id.,* at 275.

6. "Other than dividing the provisions of § III of the 1809 act into separate sections, there has not been a single change in the definition of first-degree murder in the intervening 166 years, with the single exception that the felonies of kidnapping, storehouse breaking, daytime housebreaking and escape have been added to what is now § 410." *Evans v. State,* 28 Md. App. 640, 683 n. 19, 349 A. 2d 300, 328 n. 19 (1975)

Since that update on Chapter 138 of the Acts of 1809 in *Evans,* the General Assembly on July 1, 1977, added "sexual offense in the first or second degree" to the litany of first-degree-murder-generating felonies. And see *State v. Ward, supra.*

## PENNSYLVANIA
### ACT OF 1794

"And whereas the several offences, which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment:

*Be it further enacted by the Authority aforesaid,*

That all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson,

## MARYLAND
### ACT OF 1809

"AND, whereas the several offences which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment,

therefore, BE IT ENACTED,

That all murder which shall be perpetrated by means of poison, or by lying in wait, or by any [7] kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate, any arson,

or to burn any barn, tobacco-house, stable, warehouse, or other out-house, not parcel of any dwelling-house, having therein any tobacco, grain, hay, horses, cattle, or goods, wares and merchandize,

---

**7.** One interesting difference between the Pennsylvania Act of 1794 and the Maryland Act of 1809 is that Pennsylvania refers to "any *other* kind of wilful, deliberate and premeditated killing," whereas Maryland refers simply to "any kind of wilful, deliberate and premeditated killing." By implication, Pennsylvania poison murders and lying-in-wait murders would seem to require premeditation whereas the Maryland statute does not suggest any such necessary common denominator characteristic.

| | |
|---|---|
| rape, | rape, |
| | sodomy, mayhem, |
| robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree. . . ." | robbery or burglary, shall be deemed murder of the first degree; and all other kind of murder shall be deemed murder of the second degree. . . ." |

The Court of Appeals was first called upon to interpret Chapter 138 of the Acts of 1809 in *Weighorst v. State,* 7 Md. 442, in 1855. It held, at 7 Md. 451, "The Act of Assembly does not create a new offence in distinguishing between murder of the first and second degrees. The design was to discriminate in awarding the punishment. The supposed analogy between a conviction of manslaughter and of murder in the second degree does not exist."

Thirty years later in *Hanon v. State,* 63 Md. 123 (1885), the Court of Appeals again pointed out that a statute simply altering a common law penalty or specifying circumstances of aggravation or mitigation, for penalty purposes, does not alter the fundamental nature of the common law offense. It said, at 63 Md. 126:

"The mere affixing by statute of a penalty different from that at common law, or adjusting it to specified circumstances of aggravation or mitigation, where the crime or misdemeanor is in its nature susceptible of such variations, without losing its essential character, is not the creation of a distinct offense. As an illustration of this, it has been decided that our Act of Assembly of 1809, ch. 138 (November Session), in dividing the common law crime of murder into first and second degrees, so distinguished from the circumstances accompanying the homicide, and attaching corresponding penalties, did not create a new offense."

See also *Gladden v. State,* 273 Md. 383, 330 A. 2d 176 (1974); *Stansbury v. State,* 218 Md. 255, 146 A. 2d 17 (1958); *Chisley v. State,* 202 Md. 87, 96, 95 A. 2d 577 (1953); *Abbott v. State,* 188 Md. 310, 312, 52 A. 2d 489 (1947); *Parker v. State,* 7 Md. App. 167, 254 A. 2d 381 (1969).

In 1874, the Court of Appeals dealt with a situation virtually on all fours with that now before us and we find its decision in *Davis v. State,* 39 Md. 355 (1874), fully dispositive. On April 5, 1872, Joseph Davis breached the peace of Carroll County by picking up a three-foot long iron crowbar and smashing it down upon the head of Abraham L. Lynn who by virtue of the mortal wound inflicted "did languish, and languishing, did die." Davis was convicted of murder in the first degree under an indictment charging that he did the deed described "feloniously, wilfully, and of his malice aforethought." He attacked the sufficiency of that indictment, challenging particularly the absence of any averment that his act was "deliberate" or "premeditated." It will be noted that there was there lacking not one of the statutory adjectives but two. The Court of Appeals held flatly that the circumstances constituting murder in the first degree according to the Act of 1809 are not necessary elements of the crime of murder and do not, therefore, have to be included in the indictment. The Court said, at 39 Md. 373:

> "If the circumstances which constituted the crime, or increased the punishment, were not set out in the indictment, the accused would not be informed of the offense with which he was charged, or of the penalty to which he was liable. These reasons do not apply to a statute, neither creating an offense nor enhancing its penalties, but dividing a common law offense into degrees and diminishing the punishment. The essential elements of all felonies at common law, such as murder, arson and robbery, have been ascertained and defined by innumerable decisions, and are expressed with legal certainty by certain technical terms, which have been engrafted upon our jurisprudence for centuries.

These terms are incorporated into our language as expressing *'per se'* the crime they designate, and when used in our statutes, have a legal meaning when not otherwise qualified. I Wharton Cr. L. 30. Thus, the Act of 1809, ch. 138, entitled, 'An Act concerning crimes and punishments,' Code, Art. 30, adopts the nomenclature of the common law for the catalogue of crimes enumerated therein, without attempting to define what constitutes those crimes."

The *Davis* decision asserted flatly that the term "murder" as used in the Maryland statute was one "recognized as a general denomination, including offenses differing from each other in their degrees of atrocity, but not in their nature or kind; no attempt is made to explain or modify its meaning or abridge its range. Its common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed." 39 Md. at 374.

It would not defeat the appellant's present claim that "premeditation" was not a necessary element of the crime of murder if "premeditation" were nonetheless a factor which increased the punishment. *Davis v. State,* at 39 Md. 373. As the *Davis* decision points out most clearly, however, and as history itself attests, the dividing of murder into degrees by statute in Maryland did not raise the punishment for murder in the first degree; it only lowered the punishment for murder in the second degree. Prior to the grading of murder, the punishment for all murder was capital.[8] The benign purpose behind the Pennsylvania Act of 1794 and the Maryland Act of 1809, and their counterparts in 36 other states, was simply to lower the punishment for murder in the second degree. As *Davis* again points out, at 39 Md. 374-375:

"This Act of Assembly, now codified, does not create a new crime; it neither adds to nor diminishes the

---

8. As *Davis* points out, at 39 Md. 378, "[N]or so far as concerns murder in the first degree, does it [the Act of 1809] alter the punishment, which was always death."

class of cases which constituted murder at common law; nor does it increase the punishment.

When, therefore, a person is indicted for murder, in the technical language of the common law, he is charged with a crime, which in its proper sense, includes all circumstances of aggravation . . . .

\* \* \*

The express object of the statute in dividing the crime into degrees, was the mitigation of the punishment in cases of the second degree."

With respect to punishment, let it not be forgot that historically first-degree murder is the norm and second-degree murder is the departure from that norm — not vice versa.

What emerges quite clearly is that if there was no need to allege in an indictment the fact of "premeditation" before 1809, there was no need to do so thereafter. As *Davis* made clear at 39 Md. 375, "The mode prescribed by the Code to ascertain the degree, shows beyond all doubt there was no design in the framers of the law to change the form of pleading."

The appellant makes one last valiant effort to ward off the impact of *Davis v. State* by pointing out that everything said therein in this regard was dicta. In a technical sense, he is correct but the dicta was strong and well considered. The Court of Appeals pointed out in the last half page of its 16-page opinion that the entire point had not been preserved for appellate review and gave as its ultimate holding the fact "that the writ of error does not properly lie in this case." 39 Md. at 385. It felt "constrained" to do this so that its consideration of the merits "may not hereinafter be considered as a precedent" for those who might seek to avoid the foreclosing effect of non-preservation. The well-considered dicta, however, consumed some 15½ pages of the 16-page decision and the deliberate nature of its

consideration is not only implicit in the decision itself but was made explicit at 39 Md. 385:

> "In consideration of the unusually grave and solemn position of the plaintiff in error, and the earnest zeal, devotion and learning of his counsel, we have thus far entered into the merits of the questions as if the record was properly before us; and after the most careful examination, and reflection, conclude that the plaintiff in error, has enjoyed every right and privilege guaranteed by our law and Constitution, to persons accused of crime, and that there is no error in the proceedings brought before us for review."

Whether we are technically bound by *Davis v. State* is, moreover, beside the point, just so long as we are persuaded by it; we are so persuaded. Lest there be future doubt, this is the holding upon which, primarily, we rest the present decision.

## C. DOES THE PARTICIPLE "PREMEDITATED" CARRY ANY UNIQUE, NON-REDUNDANT CONTENT NOT CONVEYED, BY NECESSARY IMPLICATION, BY EITHER OF ITS STATUTORY ADJECTIVAL COMPANIONS "WILFUL" AND "DELIBERATE" OR BY THE TWO OF THEM COMBINED?

Even if it were necessary to allege the essential elements of aggravation, however, we do not believe that the absence of "premeditated" in the indictment now before us would be fatal.

Although "any kind of wilful, deliberate and premeditated killing" became one of the four alternative criteria for first-degree murder in Maryland as of 1809, strangely, 144 years were to go by before Maryland was called upon to give even passing attention to what meanings were contained within the words "wilful," "deliberate" and "premeditated." Maryland first did so in *Chisley v. State*, 202 Md. 87, 106-107, 95 A. 2d 577, in 1953. In the intervening 26 years, both the

Court of Appeals and this Court have given at least glancing attention to the words on 17 other occasions: 1) *Faulcon v. State,* 211 Md. 249, 257-258, 126 A. 2d 858 (1956); 2) *Elliott v. State,* 215 Md. 152, 160, 137 A. 2d 130 (1957); 3) *Kier v. State,* 216 Md. 513, 522-523, 140 A. 2d 896 (1958); 4) *Brown v. State,* 220 Md. 29, 38, 150 A. 2d 895 (1959); 5) *Cummings v. State,* 223 Md. 606, 611, 165 A. 2d 886 (1960); 6) *Dunn v. State,* 226 Md. 463, 476-477, 174 A. 2d 185 (1961); 7) *Hyde v. State,* 228 Md. 209, 215-216, 179 A. 2d 421 (1962); 8) *Tull v. State,* 230 Md. 596, 604, 188 A. 2d 150 (1963); 9) *DeVaughn v. State,* 232 Md. 447, 457, 194 A. 2d 109 (1963); 10) *Howard v. State,* 234 Md. 410, 415, 199 A. 2d 611 (1964); 11) *Robinson v. State,* 249 Md. 200, 210-211, 238 A. 2d 875 (1968); 12) *Wilson v. State,* 261 Md. 551, 564-565, 276 A. 2d 214 (1971); 13) *Gladden v. State,* 273 Md. 383, 387, 330 A. 2d 176 (1974); 14) *Leyva v. State,* 2 Md. App. 120, 123, 233 A. 2d 498 (1967); 15) *Brooks v. State,* 3 Md. App. 485, 511-512, 240 A. 2d 114 (1968); 16) *Evans v. State,* 28 Md. App. 640, 658-660, 349 A. 2d 300, 314-315 (1975), and 17) *James v. State,* 31 Md. App. 666, 671-673, 358 A. 2d 595 (1976).[9]

Upon closer inspection, however, the eighteen linguistic examinations evaporate into a single one — the archetypal examination in *Chisley* itself. The seventeen that followed *Chisley* simply intoned and reintoned with ritualistic fidelity the words of *Chisley,* seldom altering so much as a comma. There was no discussion, no analysis, no reaching for further meaning. This observation is made not as a criticism but in order to make clear the point of departure — that the sum total of our case law on the meaning of "wilful," "deliberate" and "premeditated" is *Chisley* — it is the Alpha and the Omega, the beginning and the end; it is all we have. Regretfully, the *Chisley* discussion itself is limited in this regard. It runs for slightly less than a page and consists exclusively of direct quotations from two sources. The first

---

9. On one other occasion, in *Blackwell v. State,* 34 Md. App. 547, 554, 369 A. 2d 153 (1977), Judge Lowe examined the meaning of "wilful." He was not called upon in that opinion, however, to go into "deliberate" or "premeditated."

— forming the heart of our definitional law — is taken verbatim from Hochheimer (1904 Ed.), § 347:

> "*Hochheimer,* work cited, Sec. 347, p. 380, defines 'wilful' as follows: 'there must be a specific purpose and design to kill;' 'deliberate' is defined: 'there must be full and conscious knowledge of the purpose to do so;' and, 'premeditated' as: 'the design must have preceded the killing by an appreciable length of time, time enough to be deliberate. In order to justify a conviction of murder in the first degree, as thus defined, the jury must find the actual intent, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them, that this purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design'." 202 Md. at 106.

Then, by way of amplification, several passages were offered from the Court of Appeals of New York in *Leighton v. People,* 88 N. Y. 117, 120, and *People v. Majone,* 91 N. Y. 211, 212 (1883), the latter of which, in turn, was one of the sources for the above passage from Hochheimer:

> "It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. Their existence must be judged from the facts of the case. *Webb v. State, supra.* The Court of Appeals of New York, in *Leighton v. People,* 88 N. Y. 117, 120, put it in this wise: 'If, therefore, the killing is not the instant effect of impulse, if there is hesitation, or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.' The same ruling is made in *People v. Majone,* 91 N. Y. 211, 212: 'Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be

sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is.' " 202 Md. at 106-107.

Hochheimer took the phrase "time enough to deliberate" from *State v. Rutten,* 13 Wash. 203 (1895). He took the clause defining premeditation—"the design must have preceded the killing by an appreciable length of time" — from *People v. Majone, supra.*[10] For everything else, Hochheimer looked to the single source of *Commonwealth v. Drum,* 58 Pa. 9 (1868). It is an interesting and somewhat unorthodox source, for it is not an appellate opinion at all. A circuit judge in western Pennsylvania disqualified himself because of his relationship with the murder defendant. Judge Agnew,

---

10. As an insight into the redundant, and almost incestuous, nature of our meager authority in this regard, it will be noted that *Chisley* quotes directly this line from Hochheimer, which Hochheimer had, in turn, taken from *People v. Majone:*

"The design must have preceded the killing by an appreciable length of time."

Then in quoting directly from *People v. Majone* 19 lines later, *Chisley* repeats the same sentence for yet a second time:

"Such design must precede the killing by some appreciable space of time."

We received the same sentence twice, once directly and once indirectly. The quantitative authority upon which *Chisley* is based is thus reduced when we, in algebraic terms, factor out the common terms. Once again, the observation is made not to quarrel with the sentence from *People v. Majone* but simply to illustrate the narrow base of analysis from which we operate. Indeed, *People v. Majone* is instructive. After quoting the above sentence, *Chisley* goes on to quote three additional sentences following immediately thereafter. We now add, with italics, the sentence that follows immediately after those for such additional light as it throws upon "premeditation" as developed in this generative case law:

"Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is. [This much of *People v. Majone* was quoted by *Chisley. Majone* then goes on:] *The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case.*" (Emphasis supplied) 91 N. Y. at 212.

300

an associate justice of the Supreme Court of Pennsylvania, was specially designated to preside at the murder trial. The report in this case consists largely of his charge to the jury. "[B]ecause of the important legal principles declared in his charge, the case is, with his approbation, inserted" in the official Supreme Court Reports. Thus, a charge to the jury in Westmoreland County in western Pennsylvania on November 14, 1868, is the fountainhead of all of our law on "wilful, deliberate and premeditated killing." It came, to be sure, through the conduits of Hochheimer in 1904 and *Chisley* in 1953, but it came without the slightest change.[11]

What we have by way of definitional law is not, upon its face, totally free of ambiguity. Do the three adjectives "wilful," "deliberate" and "premeditated" describe three distinct aspects of the mental state we are searching for or are they, as a rhetorical device for purposes of emphasis, simply three synonyms for the same mental state? Do the second and third adjectives add anything whatsoever to the first? Can there be "a specific purpose and design to kill" without "a full and conscious knowledge of the purpose to kill"? How does one have purpose without being conscious of that purpose? To wit, can an act be "wilful" and not "deliberate"? By the same token, does the third adjective add anything to the second? How can one be "deliberate" without having had "time enough to be deliberate"? How can one do a thing (even a mental thing) without having had time to do it? Is the adjectival trinity aught but a literary flourish?

Some of the possible ambiguity inherent in the passages picked up by Hochheimer from *Commonwealth v. Drum* is resolved when we examine the rest of Judge Agnew's now classic charge in fuller context. The exclusive purpose of the adjective "wilful" and, at the very least, the primary purpose of the adjectives "deliberate" and "premeditated" are to single out for first-degree aggravation of this variety, murder of the specific-intent-to-kill type. This is murder with what has

---

11. This *nisi prius* jury charge from 111 years ago is not simply the wellspring for defining this variety of first-degree murder both in Pennsylvania and in Maryland but is the leading oracle of the law in this regard nationwide. Perkins, *Criminal Law* (2d Ed. 1969), p. 89 n. 20.

sometimes been called, confusingly, express malice. The first-degree murder statutes (the Pennsylvania Act of 1794 and its progeny, including the Maryland Act of 1809) thus distinguish, and treat as more blameworthy, murders where there has been a deliberate and intentional killing [12] from other murders involving the various forms of *mens rea* sometimes referred to by the term "implied malice" — 1) an unintended killing arising from a specifically intended infliction of grievous bodily harm; 2) an unintended killing arising out of the perpetration, or attempted perpetration, of any felony and 3) an unintended killing arising out of the wantonly reckless doing of a life-endangering act.[13]

Immediately before stating the first sentence picked up by Hochheimer, the *Commonwealth v. Drum* charge makes clear that it is the specific intent to kill which is the aggravating factor being looked at by the Pennsylvania statute:

> "In this case we have to deal only with that kind of murder in the first degree described as 'wilful, deliberate, and premeditated.' Many cases have been decided under this clause, in all of which it has been held that the *intention* to kill is the essence of the offence. Therefore, if an intention to kill exists, it is wilful; . . ." (Emphasis in original.) 58 Pa. at 16.

Immediately following a portion then picked up by Hochheimer, the *Commonwealth v. Drum* charge goes on to define premeditation in terms of the "length of time . . . necessary to form the *intention to kill*" (emphasis supplied):

> "[I]f sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design

---

**12.** *Commonwealth v. Drum* began its examination of the purpose of the Act of 1794 by noting that "Murder . . . at common law embraces cases where no intent to kill existed" and then explained that "In Pennsylvania, the legislature, considering that there is a manifest difference in the degree of guilt, where a deliberate intention to kill exists, and where none appears, distinguished murder into two grades." 58 Pa. at 15.

**13.** See *Lindsay v. State, supra,* at 8 Md. App. 104-105 n. 6 and *Evans v. State, supra,* at 28 Md. App. 695-700, for discussions of these various murderous intents.

into execution, it is premeditated. The law fixes upon no length of time as necessary *to form the intention to kill,* but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence." *Id.* at 16. (Emphasis supplied)

What is being distinguished is, upon the one hand, the murderous blow struck in an angry desire to do grievous harm or struck in the course of some felony or struck in wanton and reckless disregard of its dangerous consequences from, upon the other hand, the murderous blow struck with the specific intent to kill. Following immediately the second portion of its charge picked up by Hochheimer are the following words:

"If there be time to frame in the mind, fully and consciously, *the intention to kill,* and to select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, there is time to deliberate and to premeditate." *Id.* at 16. (Emphasis supplied)

A paragraph later, the *Commonwealth v. Drum* charge makes it preeminently clear that it is express malice — the intended killings — that should constitute murder in the first degree and it is the various forms of implied malice — the unintended killings — that shall be only murder in the second degree:

"All murder not of the first degree, is necessarily of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty; *but where no intention to kill exists* or can be reasonably and fully inferred. Therefore, in all cases of murder, *if no intention to kill can be inferred or collected from the circumstances, the verdict must be murder in the second degree."* *Id.* at 17. (Emphasis supplied)

All of the above is in total harmony with the very source of our first-degree murder itself — the Pennsylvania Act of 1794. Where did *it* come up with the three, now critical adjectives? In his scholarly research into the history of the Pennsylvania Statute, Professor Keedy has established indisputably that the words "wilful" and "premeditated" were taken from the much earlier Act of 1682. This was the first great reform statute under William Penn which abolished the death penalty for all offenses except murder and retained the death penalty only for those persons who shall "wilfully or premeditatedly kill another person." As Professor Keedy points out, it is significant to note that the words "wilfully or premeditatedly" were substituted for the words "malice aforethought" and, therefore, went to the very definition of murder itself, as opposed to describing a mere aggravating factor of an otherwise established murder. It is also clear that the substitution of words operated to retain the death penalty only for murder where there was express malice — the intent-to-kill variety — and not for murder where there was only implied malice — some murderous intent less than the intent to kill. Though this early reform statute lapsed in 1718, its ameliorating influence resurfaced 76 years later in the Act of 1794. At that later time, however, yet a third adjective — "deliberate" — joined their company. Professor Keedy establishes that this adjective came from the memoir of Justice Bradford who, in 1792, prepared for the Governor the research papers and the recommendation which formed the basis of the Act of 1794. It is furthermore clear that he used the word "deliberate" as a synonym of "premeditated," referring to the earlier act of William Penn as condemning capitally only "wilful and deliberate murder" whereas, of course, that earlier act had in fact referred to "wilful and premeditated murder." [14] All of this went to distinguish deliberate and intended killings from unintended killings.

*Commonwealth v. Drum* is, as has been pointed out, the classic exposition of the meaning of the progenitor

14. Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U. of Pa. L. Rev. 759, 760-761, 771 (1949).

Pennsylvania Act of 1794. At the very conclusion of the charge (and, as it turns out, the accepted exposition of the law), Judge Agnew, who had already distinguished murder of the specific-intent-to-kill variety from murder of what we now call the depraved-heart variety, distinguished it yet again. On this last occasion, he contrasted murder of the specific-intent-to-kill variety, which would be in the first degree, from murder of the specific-intent-to-commit-grievous-bodily-harm variety, which would only be murder in the second degree:

> "If at the time he did the act he thought of his purpose to kill him, and had time to think that he would execute it, and formed fully in his mind the conscious design of killing, and had time to think of the weapon he had prepared, and that he would use it, and accordingly so did use it, it would be murder of the first degree. But though he had prepared and carried the weapon, intending to use it, *if,* at the time the attack was made upon him *he had no real intention of killing* Mohigan — did not deliberate upon his act — *but* in the suddenness of the occasion and impetuousness of his temper *he intended only to cut, wound or do great bodily harm to him,* it would be murder of the second degree only." (Emphasis supplied) Id. at 23.[15]

Eight years after his now-famous assignment to a western Pennsylvania trial court, Judge Agnew had become Chief Justice of the Pennsylvania Supreme Court and delivered a true appellate opinion for that court in the case of *Jones v. Commonwealth,* 75 Pa. St. 403 (1874). What emerges from that opinion is the clear message that the words "deliberately and premeditatedly" connote that state of mind which we require in Maryland today for the forming of a specific intent:

> "Intoxication is no excuse for crime; yet when it so clouds the intellect as to deprive it of the power to

---

**15.** At another point the charge stated, "If, however, he had no specific intention of taking life, intended not to kill but only to maim and wound, it would be only murder in the second degree." *Id.* at 22.

think and weigh the nature of the act committed, it may prevent a conviction of murder in the first degree. *The intent to take life,* with a full and conscious knowledge of the purpose to do so, is the distinguishing criterion of murder in the first degree; and *this consciousness of the purpose* of the heart *is defined by the words deliberately and premeditatedly.*" Id. at 406. (Emphasis supplied)

This is the meaning which we, in Maryland, have always equated with the notion of specific intent. A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods. This is why even voluntary intoxication may negate a specific intent though it will not negate a mere general intent. In this regard, Judge Thompson said for this Court in *Frank v. State,* 6 Md. App. 332, 334, 251 A. 2d 249, 251 (1969);

"It is universally recognized that voluntary drunkenness is generally not a defense to crime, see *Michael v. State,* 1 Md. App. 243, 247, 229 A. 2d 145 wherein we collected the various authorities. Although the older law made no exceptions it is now equally well settled that where a crime requires a specific intent, motive, or purpose, voluntary drunkenness may be considered in determining whether or not the accused lacked the mental capacity to commit the crime. . . ."

See also *State v. Gover,* 267 Md. 602, 606-608, 298 A. 2d 378, 381 (1973); *Gover v. State,* 15 Md. App. 163, 289 A. 2d 601 (1972). It is for this reason that even voluntary intoxication may preclude a conviction for assault with intent to murder. *Avey v. State,* 1 Md. App. 178, 189, 228 A. 2d 614 (1967). It follows that the same intoxication which negates the specific intent to kill necessary for a conviction of assault with intent to murder also negates the specific intent to kill for a consummated murder (of any degree) of that express-malice variety.[16] The requisite specific intent element is the same whether the victim lives or dies.

We may understand the intentional or deliberate killing the better when we appreciate that the species "specific intent to kill" is but a member of the broader genus "specific intent." The larger class "specific intent" includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the specific-intent-to-inflict-grievous-bodily-harm variety of murder. Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result. This is classically the language of that variety of first-degree murder now under discussion, as well as of specific intent generally.

What emerges from analysis is that the Pennsylvania Act of 1794 and the Maryland Act of 1809 and their ilk singled out as more blameworthy (therefore of the first degree) that murder which resulted from express malice, from an intentional killing, as opposed to those other murders where the killing itself was unintentional or where the intention was ambiguous — the various forms of implied malice. Those statutes might well have spoken of specific-intent-to-kill

---

16. It does not, however, negate second-degree murder generally for there may still be murder in the second degree of the depraved-heart variety, where one even recklessly directs a dangerous and deadly weapon at a vital part of the human anatomy. LaFave and Scott, *Criminal Law* (1972), p. 345, p. 545. Second-degree murder of that variety requires a mere general intent and not a specific intent.

murder, except that such a vocabulary was not yet in the language of the law as of 1794 and 1809. The statutes found other words to isolate the intentional killing. The object of all three adjectives employed is the gerund "killing." What is most abhorrent, among murders, is "wilful . . . killing," "deliberate . . . killing" and "premeditated killing." This is not a series of distinct mental states but a repetitive stressing of the same mental state — the requirement that the killing itself, and not merely the murder-producing act, be intentional and purposeful. There is a circular quality to the threesome. They define themselves in terms of each other.

*Chisley,* Hochheimer and *Commonwealth v. Drum* all define "wilful" as "there must be a specific purpose and design to kill." This is, *ipso facto,* a specific intent to kill. *Chisley,* Hochheimer and *Commonwealth v. Drum* go on to define "deliberate" as "there must be full and concious knowledge of the purpose to do so [kill]." Both the notions of "wilfulness" and of "specific intent" embrace "consciousness" and "knowledge" and "purpose." A purposeless act is, by definition, an act without a specific intent. One cannot entertain a specific intent unknowingly or unconsciously. In his excellent discussion in *Blackwell v. State,* 34 Md. App. 547, 554, 369 A. 2d 153 (1977), Judge Lowe equates "wilful" and "deliberate" and "intentional," as well as "designed" and "conscious," pointing out that "wilfulness":

> "connotes a *deliberate* intent to bring about the result which actually comes to pass, *i.e.:*
>
>> 'Proceeding from a *conscious* motion of the will; voluntary.
>>
>> Intractable; having a headstrong disposition to act by the rule of contradiction.
>>
>> Intending the result which actually comes to pass; *designed; intentional;* not accidental or involuntary.' (citations omitted). *Black's Law Dictionary* 1773 (rev. 4th ed. 1968)." (Emphasis supplied)

There is finally "premeditated," which *Chisley* and Hochheimer define as "the design must have preceded the killing by an appreciable length of time, time enough to be deliberate." When there is deliberation, there has been, of necessity, time for deliberation, to wit, "premeditation." One cannot deliberate without having had time to deliberate. If there has been no premeditation, there cannot have been deliberation. *Chisley,* quoting from *People v. Majone,* goes on:

> "[T]he time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is." 202 Md. at 87.

When there is the formation of a specific intent to kill or "a definite purpose to kill," there has been, of necessity, time for the formation of such specific intent or such "definite purpose to kill," to wit, "premeditation." One cannot form a purpose without having had time to form that purpose.

In the instant case, therefore, the allegation that there was a "wilful and deliberate killing" fully conveyed any notion contained within the additional adjective "premeditated," as that term is used in current law as opposed to in lay usage. Even if aggravation needed to be alleged (it does not), it would not need to be alleged redundantly. "Wilful" and "deliberate" say all there is to say.

## D. DOES "PREMEDITATED," STANDING ALONE, STILL CONVEY ANY MEANING AT ALL OR HAS IT GONE THE WAY OF ITS COMMON LAW ANCESTOR "AFORETHOUGHT" AND BEEN DRAINED OF ALL PRESENT CONTENT?

Beyond the question of redundancy, however, what present content, if any, is there to the word "premeditated" as an added dimension to an already posited specific intent to kill?

Even assuming that "premeditated" once embraced a wider band along the time scale than that little moment in which to choose between killing and killing not, it has not compassed

more than that for a century. In its march toward semantic extinction, it trod in the veritable footsteps of its linguistic forebear "aforethought" and its doom was similarly predictable. Nor is the loss significant, for the lost meaning is not the true mark of the thing we seek. In our long groping for a test to sort out more blameworthy murders from less blameworthy ones, we have been looking for a distinction which really lies along the horizontal axis — a qualitative difference between murderous intents, separating 1) intentional killing from 2) unintentional killing that occurs in the course of some nonetheless murderous act. In our uncertain quest for that distinction, we sometimes mistakenly sought it along the vertical axis, within a single murderous intent, as we seemed to draw a line between a *sudden* specific-intent-to-kill and a *more leisurely* specific-intent-to-kill. The time span through which the intent was formed, of course, was never significant in itself. It was only evidence of the existence of the deliberate intent to kill. As an unseen psychic phenomenon, intent is admittedly difficult to measure. In our earlier efforts to come to grips with the troubling business of proof, we confused the mere evidence of the thing (the time for thought) with the thing itself (the thought).

Late medieval England strove to separate qualitatively the two essential kinds of unlawful homicide which perplexed the realm — 1) the deliberate killing from ambush on a lonely forest trail or in a darkened London alley from 2) the impulsive killing in a village brawl as one combatant angrily smashed in a head with a quarterstaff or ran through a stomach with knife or sword. This latter variety of homicide — chaud medley or chance medley (not condoned but readily understood by a rude and riotous folk) — would someday give rise to modern manslaughter. Its first office, however, was to serve as the classification for those thoughtless murders perpetrated without "malice prepense" or "malice aforethought" which were deemed less blameworthy and, therefore, clergyable and non-capital, in contradistinction to the murderous bush-whackings and ambushcades carried out with "malice prepense" or "malice aforethought" which were deemed most blameworthy and, therefore, non-clergyable

and capital. Initially, we took the time for forming the more evil intent as certain evidence of the more evil intent itself. The purpose of the distinction was benign. We may now, however, accomplish the same benign purpose by drawing a more sensible boundary along the horizontal axis — among the types of murderous intents. The angry and impulsive blow struck 1) with intent to do grievous bodily harm, 2) with wanton and reckless disregard of the consequences or 3) with undifferentiated and ambiguous intent will not be first degree murder of the "wilful, deliberate and premeditated killing" variety. We should not attempt to discriminate along the vertical axis — within the single type of "specific intent to kill" murder by drawing an unreal line between a "wilful, deliberate and premeditated" specific intent to kill and an "unwilful, undeliberate and unpremeditated" specific intent to kill (a contradiction in terms; a verbal absurdity).

Even by the late 1500's the idea that the swiftness of forming a murderous intent necessarily derogated from its more blameworthy quality began to erode under the buffeting of developing case law. By the mid-1600's, "aforethought" meant "no time interval at all." As has been pointed out in Purver, *The Language of Murder,* 14 U.C.L.A. L.Rev. 1306, 1309 (1967):

> "Since today 'aforethought' may be 'as instantaneous as successive thoughts of the mind' or 'on the spur of the moment,' the word no longer serves its original function of drawing attention to the duration of the deliberation to kill as the criterion for distinguishing murder from other homicides."

To the same effect is Perkins, *Criminal Law* (2d Ed. 1969), at 34-35:

> "Undoubtedly the word 'aforethought' was added to 'malice' in the ancient cases to indicate a design thought out well in advance of the fatal act. But as case after case came before the courts for determination, involving killings under a great variety of circumstances, there came to be less and less emphasis upon the notion of a well-laid plan. And

at the present day the only requirement in this regard is that it must not be an *after* thought. 'Killing with malice' is sufficient of itself to negative any possible notion of an afterthought, and apart from the historical background the word 'aforethought' would not be needed."

1 Wharton, *Criminal Law and Procedure* (Anderson Ed. 1957), Sect. 243, says at 527:

"The fact that malice afterthought means merely that malice must exist at the same time as the act, in effect makes 'aforethought' meaningless surplusage, since the requirement is satisfied by the presence of malice or 'concurrent' malice rather than an antecedent malice. The unimportant character of the adjective 'aforethought' is seen in the fact that in many opinions 'malice' and 'malice aforethought' are used interchangeably and that in many, 'aforethought' is itself omitted."

As we ourselves pointed out in *Evans v. State,* 28 Md. App. 640, 693-695, 349 A. 2d 300 (1975):

"A similar erosion took place with respect to the word 'aforethought.' In its pristine state, it connoted that the intention to kill had existed some appreciable time before the actual execution of the deed. It connoted the same thing by way of preplanning that premeditation connoted early in the 19th century (when it entered the law as an attempt to rejuvenate the earlier meaning of 'aforethought') and significantly more by way of preplanning than premeditation connotes today (premeditation having in the meantime suffered a semantic erosion of its own). The word 'aforethought' today is devoid not simply of an ordinary, layman's meaning but of any meaning at all, even as a term of art.

\* \* \*

The word 'aforethought' is today an absolutely useless appendage on our law. It has over the

centuries been utterly drained of any meaning whatsoever. As a word of no utility but with an ever-present potential for confusion (some may innocently think that 'aforethought' means aforethought), it should be struck from the lexicon of our homicide law."

The capstone upon this issue was placed by a Prince George's County trial judge who refused to instruct on the word "aforethought" and received in that regard our seal of approval in *Godwin v. State,* 38 Md. App. 716, 731, 382 A. 2d 596 (1978), reversed in part on other grounds in *Godwin v. State,* 284 Md. 85 (1978):

"Following the court's instructions, the exchange that occurred between appellant's counsel and the trial judge is enlightening:

'With regard to your definition of murder in the first definition, Your Honor gave — you said it was killing with malice. You did not use the phrase 'with malice aforethought' as a distinction between —
THE COURT: I don't know what 'aforethought' is.'

We applaud both the candor and the correctness of the statement. As of the Twentieth Century at least, the word 'aforethought' is absolutely devoid of any meaning whatsoever."

What happened to "aforethought" in the Sixteenth and Seventeenth Centuries happened to its lineal descendant "premeditated" in the Nineteenth and Twentieth Centuries. In an effort to diminish the class of capital murders, the framers of the Pennsylvania Act of 1794 (and whatever they intended is presumably what we intended in 1809, for there is no evidence of any independent legislative or judicial thought upon the subject in Maryland) may well have sought to reestablish as a necessary condition for capital murder that same notion of "aforethought" that had been a necessary condition for capital murder from 1496 through the late

1500's. The former Saxon term was not available, however, for though it had been dead for two centuries in terms of any viable meaning, its ghost still walked grandly and officially throughout the form books. Ancient verbal formulas will not lightly be tossed aside even when they have become gibberish. The Pennsylvanians, both the Saxon and French forms having been exhausted, turned to the Latin derivative "premeditated." [17] It was literally a synonym, to be sure, but a synonym with a difference. It had not yet been emasculated by several centuries of devastating case law. Its time, however, was not long in coming.

Moreland, *Law of Homicide* (1952), is instructive at 200:

> "The most striking thing about this statute [the Act of 1794] is the substitution of the word 'premeditated' for the common law word 'aforethought.' ... They, in effect, resurrected the original meaning of 'aforethought.' If history is an acceptable teacher they might have anticipated that as in the case of 'aforethought,' the element of pre-design would eventually be read out of 'premeditated' by the judges. Wilful and deliberate being words which fundamentally mean no more than intentional, the first degree murder would then require no more in fact than an unlawful, intentional homicide."

Perkins, *Criminal Law* (2d Ed. 1969), says at 92:

> " 'Premeditation' means 'thought of beforehand' for some length of time, however short.' One who has in mind how completely the element of time disappeared from the concept of malice aforethought need not be too surprised at the treatment sometimes accorded the word 'premeditated.' Those who first employed this word in this type of first-degree murder statute undoubtedly had in mind a malicious scheme thought

---

**17.** Should some future legislative generation elect to try again, it will presumably turn to a Greek form, perhaps "propsychic."

out well in advance of the fatal act itself. And unless we are willing to ignore the plain meaning of words we are forced to recognize that a fatal act might be intentional and yet entirely too hasty to be deliberate and premeditated. The notion that a fully-formed intent is always deliberate and premeditated, no matter how short the time between the first thought of the matter and the execution of the plan, is preposterous. And yet some of the courts have taken just such a position. The leading case on this point is *Drum,* in which the Pennsylvania court said: 'Therefore, if an intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence.' In line with this suggestion it has been said that one may be guilty of murder in the first degree although the intent to commit such homicide is 'formed by the accused immediately before the act is actually committed,' or 'at the very moment the fatal shot was fired.' "

Knudson, *Murder by the Clock,* 24 Wash.U.L.Q. 305 (1939), commented upon the fate of "premeditated design" in the case law of New York, at 311:

"The trial courts, however, thought otherwise and held that 'premeditated design' meant merely *actual intent to kill,* even though formed at the very instant of killing. And the Court of Appeals stamped its approval on this course of the law in two important cases in 1851 and 1852, *People v. Clark* and *People*

*v. Sullivan.* These two cases have not only had an important bearing on the law in point in New York ever since but have reached out into other states to entangle their laws."

Knudson concluded, at 313, "The term 'premeditated' lost all significance and becomes substantially equivalent to the words 'actual intent.'"

Perkins, *A Re-examination of Malice Aforethought,* 43 Yale L.J. 537 (1934), says in this regard at 538:

> "It is perhaps inaccurate to speak of 'aforethought' as having any common usage on the street. At its face value, however, it means 'thought of beforehand,' and the layman uses this phrase to imply the mental process involved where a matter has been pondered over for a substantial period of time in advance. But not even 'wilful, deliberate and premeditated malice aforethought' conveys any such message as this to the legal mind. First degree murder can be established on this basis, although the intent to kill is 'formed by the accused immediately before the act is actually committed,' or 'at the very moment the fatal shot was fired.' As one court has said: 'The act may follow the intent as rapidly as thought may pass through the mind, and if the intent [to kill] be followed by an act which results in the taking of human life with malice aforethought, it is murder in the first degree.'"

The case law confirms the academic comment. Significant is the fate of the original Pennsylvania Act itself. Brenner, *The Impulsive Murder and the Degree Device,* 22 Ford L.Rev. 274 (1953), points out, at 281:

> "In Pennsylvania, the first state to create degrees of murder, the transformation into terms of art of the statutory standard separating first-degree from second-degree murder has been both rapid and complete. The 'wilful, deliberate and premeditated' intent set forth by the statute has been equated to

a specific intent to kill. This development is illustrated by the recent case of *Commonwealth v. Jones.* In that case the defendant pleaded guilty to having beaten to death with an eight-pound iron bar his former mistress and her then paramour. The homicides followed an altercation with the pair which the defendant claimed drove him 'haywire.' In fixing the murder at first-degree, the court, after declaring that first-degree murder is distinguished from second-degree murder in that the former requires a specific intent to take life, stated that:

> 'Such intent supplies the qualities of wilfulness, deliberation and premeditation otherwise essential, by the statute, to murder in the first degree.' "

Professor Keedy in his *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U. of Pa.L.Rev. 759 (1949), wrote to a similar effect, at 773:

> "Soon after the statute was enacted the judges began to nullify its requirements by refusing to give effect to the meaning of the words 'deliberate' and 'premeditated,' and by announcing the proposition that killing with an intent to kill constitutes first degree murder."

Indeed, in *Keenan v. Commonwealth,* 44 Pa. 55 (1862), decided six years before the wellspring of *Commonwealth v. Drum,* the Supreme Court of Pennsylvania summarized the case law between that time and the enactment of the Act of 1794 and offered that "our reported jurisprudence is very uniform in holding that the true criterion of the first degree is the intent to take life," *id.* at 56. Within a bare three years of the enactment of the Act of 1794, Chief Justice McKean in *Commonwealth v. O'Hara,* 7 Smith 694, 695 (Pa. 1797), found deliberation and premeditation in a case of a sudden and impulsive killing of one friend by another in immediate response to an insult. In commenting upon the 1797 ruling (which had been part of the common law of Pennsylvania

interpreting the Act for 12 years when Maryland adopted it in 1809), *Jones v. Commonwealth,* 75 Pa. 403 (1874), said at 407, "In such a case, a moment was sufficient to form and deliberate upon the purpose to take life, and premeditate the means of executing it."

The trend is nationwide. "Deliberation and premeditation may be instantaneous." *Aldridge v. United States,* 47 F. 2d 407, 408 (D.C. Cir. 1931). "The period of time required for premeditation and deliberation in first-degree murder is only that which is necessary for one thought to follow another." *Bradney v. People,* 162 Colo. 403, 426 P. 2d 765 (1967). For a killing to be premeditated there "need be no appreciable space of time between the intention to kill and the act of killing — they may be as instantaneous as successive thoughts of the mind." *Carey v. State,* 91 Idaho 706, 429 P. 2d 836, 840 (1967). "Hesitation even may imply deliberation. So may threats against another and selection of means with which to perpetrate the deed." *Leighton v. People,* 88 N. Y. 117 (one of the source cases for *Chisley.*) "[I]t is the fully formed purpose, not the time, which constitutes the higher degree." *Commonwealth v. Scott,* 284 Pa. 159, 130 A. 317 (1925). "If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months. It is enough that the intention precedes the act although that follows instantly." *People v. Clark,* 7 N. Y. 385, 394 (1852). In *People v. Jackson,* 196 N. Y. 357, 89 N. E. 924, 925, the Court of Appeals of New York affirmed a conviction based upon the following charge:

"But the time that elapses which shows deliberation need not be a day. It need not be a minute. It may be a second, or a fraction of it. It must be time enough so that reasons arise for not doing the act thought of, and so that the mind makes its choice and decides to do that which was done."

This diminution of the time interval virtually to the vanishing point is illustrated by the following definitions of the necessary interval: "only an instant," *State v. Masato Karumai,* 101 Utah 592, 600, 126 P. 2d 1047, 1051 (1942); "no particular time," *Bailey v. Commonwealth,* 191 Va. 510, 62 S.E.2d 28, 31 (1950); "thought beforehand . . . however short," *State v. Lamm,* 232 N. C. 402, 406, 61 S.E.2d 188, 191 (1950); "no appreciable space of time between the intention . . . and the act . . . that may be as instantaneous as successive thoughts of the mind," *People v. Smith,* 15 Cal. 2d 640, 648, 104 P. 2d 510, 514 (1940).

The same process has been inexorably at work in Maryland. The evidence was found to be legally sufficient to support deliberation and premeditation in the following questionable circumstances: *Houston v. State,* 225 Md. 403, 171 A. 2d 233 (1961) (a street fight where the defendant only turned upon the victim at the moment when the victim attempted to dissuade him from killing another); *Cook v. State,* 225 Md. 603, 171 A. 2d 460 (1961) (an unexplained killing following a drunken quarrel); *Taylor v. State,* 226 Md. 561, 174 A. 2d 573 (1961) (a drunken quarrel with the time interval being represented by the time necessary to walk across the room, pick up a gun, raise it and fire it); *Detoro v. State,* 227 Md. 551, 177 A. 2d 847 (1962) (a drunken and jealous quarrel with the time for premeditation being represented by a walk to the kitchen to pick up a knife and the use of it a minute or two later); *Martin v. State,* 228 Md. 311, 179 A. 2d 865 (1962) (a drunken and jealous quarrel); *Leyva v. State,* 2 Md. App. 120, 123, 233 A. 2d 498 (1967); *Dubs v. State,* 2 Md. App. 524, 538-539, 235 A. 2d 764 (1967); *Brooks v. State,* 3 Md. App. 485, 513, 240 A. 2d 114 (1968). The classic instance of this erosion is *Chisley v. State,* 202 Md. 87, 95 A. 2d 577 (1953). Chisley had been drinking and was riding home with his father, the father's brother-in-law and the victim. Chisley was sleeping. When the car arrived home, the father got out first, followed by the father's brother-in-law. At that point, the brother-in-law told the father that the father had dropped some cigarettes. This was the onset of trouble. Chisley said the cigarettes were his and the victim said that they were not.

The father described what followed that exchange: "That's all there was to it. He gets out the gun and shot him; there wasn't any argument to it." A second shot later followed the first shot. Ignoring the very real possibility that the first shot may well have been the fatal one, the Court of Appeals held that the time interval between the two shots was sufficient to permit a finding of deliberation and premeditation.

One has to ask of "premeditated" what Professor Perkins once asked of "malice aforethought": "Has it a real contribution to offer, or is it merely a euphonious phrase used to conceal the absence of an idea?" [18] One might say of "premeditated" what one commentator once said of "malice aforethought":

"[T]he phrase ... used in defining murder, peers at us like a demon through the dust of more than four hundred years of history, lying in wait to clutter statutes and confuse juries. In examining the historical background of the phrase, one probes the roots of a term which, though withering on the vine, lives on to strangle the penal codes of the several states." [19]

There yet may be, however, some residual function for the word "premeditated" or, at least, for the fuller phrase "wilful, deliberate and premeditated." When dealing with murder of the specific-intent-to-kill variety, it would not appear that there is any necessary content, as an absolute matter of law, to the words. Whenever there is evidence of a specific intent to kill, it follows that there is at least a permitted inference of wilfulness, deliberation and premeditation as these terms have been liberally interpreted by latter-day case law. To the extent to which there is some arguable nuance of difference between second-degree murder of the specific-intent-to-kill variety and first-degree murder of that same variety, the preciously small cargo of metaphysical difference would seem to be carried exclusively

---

18. Perkins, *A Re-examination of Malice Aforethought,* 43 Yale L.J. 537 (1934).

19. Purver, *The Language of Murder,* 14 U.C.L.A. L.Rev. 1306 (1967).

by the adjective "deliberate" rather than by its two companions. The lack of necessary additional content, however, does not preclude the *possibility* of additional content whenever a jury might wish to read in such additional content. The very ambiguity of the terms would seem to give the jurors the discretion to move upward to a first-degree verdict whenever the circumstances of heinousness and atrociousness inspire them to move upward and yet permit them to move downward to a second-degree verdict when some undifferentiated compassion persuades them to move downward. As Professor Fletcher recently pointed out, "The historic function of this formula [premeditation and deliberation] is determining whether the murder is sufficiently heinous to be subject to the extreme penalty of death." [20] The words are sufficiently flexible to permit a jury to go either way.

The questionable wisdom, however, of permitting these flexibly construed words to serve as a mere discretionary device in the hands of the jury was pointed out by Benjamin Nathan Cardozo in one of the most thoughtful and profound analyses ever made of this troubled subject:

> "The difficulty arises when we try to discover what is meant by the words deliberate and

---

**20.** Fletcher, *Rethinking Criminal Law* (1978), p. 253. Professor Fletcher goes on at p. 254:

> "[T]he problem that has beset this formula is that while planning and calculating represent one form of heinous or cold-blooded murder, premeditation is not the only feature that makes intentional killings wicked. Wanton killings are generally regarded as among the most wicked, and the feature that makes a killing wanton is precisely the absence of detached reflection before the deed. Fitzjames Stephen put the case of a man who 'sees a boy sitting on a bridge over a deep river and, out of mere wanton barbarity, pushes him into it and so drowns him.' Killing without a motive can usually be just as wicked as killing after detached reflection about one's goals. Thus there is obviously a flaw in the criterion of 'premeditation and deliberation.' . . .
>
> As a result of this flaw, the courts are constantly buffeted between two inconsistent pressures in their efforts to lend meaning to the concept of 'premeditation.' One thrust is to stress the elements of time, reflection and cold-bloodedness as the distinction between first- and second-degree murder. The competing thrust is to interpret the law so as to accommodate all heinous and wanton killings within the definition of first-degree murder."

premeditated. . . . The human brain, we are reminded, acts at times with extraordinary celerity. All that the statute requires is that the act must not be the result of immediate or spontaneous impulse. . . .

I think the distinction is much too vague to be continued in our law. There can be no intent unless there is a choice, yet by the hypothesis, the choice without more is enough to justify the inference that the intent was deliberate and premeditated. The presence of a sudden impulse is said to mark the dividing line, but how can an impulse be anything but sudden when the time for its formation is measured by the lapse of seconds? Yet the decisions are to the effect that seconds may be enough. . . . I think the students of the mind should make it clear to the lawmakers that the statute is framed along the lines of a defective and unreal psychology. If intent is deliberate and premeditated whenever there is choice, then in truth it is always deliberate and premeditated, since choice is involved in the hypothesis of the intent. What we have is merely a privilege offered to the jury to find the lesser degree when the suddenness of the intent, the vehemence of the passion, seems to call irresistibly for the exercise of mercy. I have no objection to giving them this dispensing power, but it should be given to them directly and not in a mystifying cloud of words. The present distinction is so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it. I am not at all sure that I understand it myself after trying to apply it for many years and after diligent study of what has been written in the books." [21]

We do not think the word "premeditated" today means, of necessity, anything more than "having made the choice to

21. An address delivered before the New York Academy of Medicine on November 21, 1928, reprinted in *The Selected Writings of Benjamin Nathan Cardozo* (1947), pp. 382-384.

kill," a notion already conveyed by the specific intent to kill itself and conveyed, beyond even theoretical argument, by the addition of the adjective "deliberate."

> *Judgment affirmed; costs to be paid by appellant.*