574 A.2d 29

**Curtis Ray BRYANT**

v.

**STATE of Maryland.**

**No. 1466, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

June 1, 1990.

Michael R. Malloy, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before GILBERT, C.J., and MOYLAN and ROBERT M. BELL, JJ.

MOYLAN, Judge.

The appellant, Curtis Ray Bryant, was convicted by a Prince George's County jury of 1) attempted murder in the first degree, 2) statutory maiming, 3) assault with intent to disable, and 4) assault and battery. He received a sentence of thirty years for the attempted murder and a consecutive sentence of ten years for the statutory maiming. The assault with intent to disable and the assault and battery convictions were merged into that for statutory maiming. Upon this appeal, the appellant raises the following four contentions:

1. That the trial judge erroneously refused to instruct the jury that considerations of perfect self-defense, of imperfect self-defense, and of intoxication bear upon the statutory maiming and the assault with intent to disable charges as surely as they bear upon the attempted murder charge;

2. That the court erroneously permitted the State to enter a *nolle pros* on the charge of assault with intent to murder;

3. That the court erroneously admitted inflammatory photographs; and

4. That the court erroneously failed to give the appellant credit for pretrial time served.

## The Facts

The evidence revealed an unusually vicious and savage attack. The victim, Wallace Upshaw, and the appellant were homosexual lovers who had known each other for five years. At the time of this assault on January 29, 1989, the appellant was renting a room in Upshaw's house. The two men had been sexually intimate three days before this assault occurred.

Between 2 A.M. and 5 A.M. on the morning of January 29, the appellant and Upshaw together drank a quart or more of gin. Several other persons, including Upshaw's other roommate, were present smoking crack cocaine. Someone in the group was in possession of "love boat," a mixture of marijuana and PCP. Upshaw testified that he did not use any drugs that morning, although he had previously been a user of crack, of PCP, and of "love boat." The appellant testified that he smoked both "love boat" and crack that morning.

At approximately 5 A.M., Upshaw and the appellant left Upshaw's home to go to the District of Columbia. According to Upshaw, the trip was to have breakfast and meet some friends. According to the appellant, the two of them left on an expedition to buy more crack cocaine. At one point, the two of them sat down by a cemetery and waited for a bus.

Upshaw claimed that the appellant suddenly pulled a knife and threatened that he would murder him. Upshaw told the appellant that he was "all drunked up" and "acting all high." The appellant lunged at Upshaw with the knife, cutting Upshaw's hands and head. The appellant chased Upshaw and continued to strike at him with the knife. As Upshaw ran toward a creek and a wooded area of the cemetery, the appellant caught him and stabbed him in the back. Upshaw fell to the ground. The appellant announced that he was a murderer who intended to murder Upshaw.

He continued to stab Upshaw about the head until Upshaw rolled into the creek. The appellant then cut off part of one of Upshaw's ears, "plucked" one eye out, stabbed Upshaw's other eye, and slashed his neck. He held Upshaw's head underwater while he stabbed him in the head and back. After stabbing him over forty times, the appellant rolled him over into a face-up position. Upshaw "played possum," pretending to be unconscious, if not dead. The appellant kicked him in the side and walked away.

The appellant's version of the incident was that, as the two of them were on their way to buy crack cocaine, Upshaw suddenly grabbed him and kissed him, which shocked the appellant. Upshaw then pulled out a knife. The appellant pushed him away and ran into the graveyard. According to this version, it was Upshaw who was chasing the appellant with the knife. The appellant claimed that he was afraid that Upshaw would kill him. He testified that when he fell to the ground, Upshaw jumped on him and began choking him. The appellant defended himself with his own knife.

The caretaker of the cemetery testified that during the early morning hours of January 29, he heard someone calling for help. It was the appellant, who was walking slowly and carrying a bloody knife. The appellant mumbled something to the effect that, "they would not fuck with him or fuck him." The caretaker ran into his house and the appellant left. The caretaker called the police. He then went outside, where he found Upshaw lying on the ground.

Denise Prather, who lived near the cemetery, described the appellant's coming to her house and asking to use the telephone to call his mother. His clothes were covered with blood. After leaving her house, he was arrested outside.

### The Defenses of Intoxication, Self–Defense and Imperfect Self–Defense

The appellant, by his own testimony, generated genuine jury issues with respect to 1) self-defense; 2) *a fortiori*, imperfect self-defense; and 3) intoxication in a degree destroying his capacity to form a specific intent. Although his requests were less than models of precision in terms of the charges they were intended to cover, the appellant adequately communicated that he wanted jury instructions covering these three separate theories of exculpation and/or mitigation.

In instructing the jury on the crime of attempted murder in its various degrees, the trial judge gave a full and

complete instruction on both self-defense and imperfect self-defense. Those instructions, however, clearly were given within the sole context of the attempt charge. It was only after the discussion of attempt law had been completed that the court went on to define, briefly and separately, the crimes of statutory maiming, assault with intent to disable, and assault and battery.

At the very end of the instructions, the trial judge took up for the first time the question of intoxication. It is clear from the instruction itself that it was directed exclusively to the distinction between attempted murder in the first degree and attempted murder in the second degree. There is no reference to its possible applicability to any of the other charges in the case specifically or to the existence of a specific intent generally:

"Now, you've heard talk in this case of the use of intoxicating drugs and alcohol. Voluntary intoxication may be a defense to first-degree murder. It is not a defense to second-degree murder because that charge does not require premeditation and deliberation. If the Defendant was so intoxicated at the time of the homicide that he was unable to have acted deliberately or with premeditation, then he cannot be guilty of first-degree murder, although he could be guilty of second-degree murder. A person can be drinking or taking drugs and can even be intoxicated, but still have the necessary mental facilities to act deliberately and with premeditation.

In order to convict the Defendant of first-degree murder the State must prove beyond a reasonable doubt that the degree of intoxication did not prevent the Defendant from acting deliberately or with premeditation, so you have to consider the evidence that you've heard concerning intoxication and determine whether or not the State has proven beyond a reasonable doubt that the actions of the Defendant in attempting to murder the victim were premeditated or not and you may consider that intoxication in determining whether the State had proven that

beyond a reasonable doubt, but that's the only thing you can consider, the voluntary intoxication with respect to premeditation necessary to make second-degree murder first-degree murder."

When counsel approached the bench following the conclusion of the jury instructions, defense counsel made it clear that he wanted the jury to be informed that the defense of self-defense and the defense of intoxication went to the crimes of statutory maiming and assault with intent to disable as well as to attempted murder. The court declined to give a supplemental instruction.

## *The Continuing Viability of Merged Convictions*

As we consider the appellant's contention that certain instructions given with respect to the attempted murder charge should have been given with respect to the companion charges as well, our focus is not limited to the conviction for statutory maiming for which the appellant received a separate and consecutive sentence of ten years. He was also convicted of assault with intent to disable and of assault and battery. Although those convictions were merged into the conviction for statutory maiming, they are not forever obliterated. The reason for their merger is to protect the appellant from multiple punishment for "the same offense."

As long as the total package is vulnerable to appellate or other post-conviction review and to the possibility of remand and retrial, those merged convictions are, however, simply in a state of suspended animation. If, as shall happen in this case, the statutory mayhem were remanded for retrial, they would reemerge as viable lesser included charges. If for some reason, such as the failure of proof of an essential element, a reconviction did not follow on the major charge, those reemerged charges themselves could serve as the basis for conviction and sentence. Because of their residual potential for continuing vitality, therefore, we focus our attention upon them as well.

### Imperfect Self–Defense Limited to Actual or Inchoate Homicide

■ Criminal homicide is extremely unusual in its proliferation of levels or degrees of blameworthiness. Except for its reflected influence on its inchoate, shadow crimes of assault with intent to murder, attempted murder, and conspiracy to murder, it alone has an extenuated or mitigated form (voluntary manslaughter) for purposes of lowering the maximum punishment.[1]

Voluntary manslaughter is something other than the mere absence of aggravating factors that would raise the level of guilt to murder in either the first or second degree. It is predicated upon the affirmative presence of some extenuating fact that will operate to mitigate the level of guilt and, therefore, the punishment. One of the extenuating factors that gives rise to the crime of voluntary manslaughter is that of imperfect self-defense. For purposes of this discussion, it is not necessary to go into its substantive ramifications.

It is enough to note that imperfect self-defense as a mitigating factor (as, indeed, the very phenomenon of mitigation generally) is limited to criminal homicide and its shadow forms, such as the attempted murder in this case. The origins and the purpose of imperfect self-defense have been thoroughly reviewed and well summarized in Judge Cole's excellent opinion for the Court of Appeals in *State v. Faulkner*, 301 Md. 482, 483 A.2d 759 (1984). *See also Shuck v. State*, 29 Md.App. 33, 40–44, 349 A.2d 378 (1975); *Law v. State*, 29 Md.App. 457, 462–465, 349 A.2d 295 (1975).

---

**1.** A sexual offense, to be sure, apparently comes in four degrees or levels of blameworthiness. It is not comparable, however, to criminal homicide. A sexual offense in either the third or fourth degree is, by statutory definition, a totally different crime from a sexual offense in the first or second degree. To ascend from the second to the first degree, moreover, involves nothing more than the addition of one factor from a list of specified aggravating factors. There is nothing comparable to the mitigated or extenuated level of blameworthiness represented by voluntary manslaughter.

Maryland is fully in line with the recognized academic authorities. Imperfect self-defense is an aspect of homicide law and nothing more. Outside of homicide law, the concept doesn't exist. The total discussion of imperfect self-defense in W. LaFave & A. Scott, *Criminal Law* § 5.7 (2d ed. 1986), at 463, consists of the following:

"We have noted that one who uses force against another with an honest but unreasonable belief that he must use force to defend himself from an imminent attack by his adversary is not, in most jurisdictions, justified in his use of force, for proper self-defense requires that the belief in the necessity for the force he uses be reasonable. Although in many jurisdictions such a person is guilty of murder when he uses deadly force in such circumstances, some courts and legislatures have taken the more humane view that, *while he is not innocent of crime, he is nevertheless not guilty of murder; rather, he is guilty of the in-between crime of manslaughter.*" (Footnotes omitted) (Emphasis supplied).

With respect to all other crimes, the defendant is either guilty or not guilty. He either acted in self-defense or he did not. There is no "in between." Under the circumstances, the judge was correct in declining to give an instruction on the subject of imperfect self-defense with respect to the charges of statutory maiming, assault with intent to disable, and assault and battery.

### *Self–Defense Applicable to Assault Crimes Generally*

█ An instruction with respect to true self-defense, however, should have been given. Although discussions of self-defense in the context of homicide cases understandably have dominated the field, the simple and frequently neglected larger truth is that the defense of self-defense applies to assaultive crimes generally. There is no question but that self-defense was generated in the present case. The substantive subtleties of self-defense are not an issue here.

The defense being applicable to common law assault and battery generally, it is by necessary implication applicable to the various forms of aggravated assault. Assault with intent to disable, under Md. Ann.Code art. 27, § 386 (1987), is obviously such an aggravated assault. LaFave & Scott, *supra* § 5.7, at 454–455, discusses this general applicability of the defense:

> "It is only just that one who is unlawfully attacked by another, and who has no opportunity to resort to the law for his defense, should be able to take reasonable steps to defend himself from physical harm. *When the steps he takes are reasonable, he has a complete defense to such crimes against the person as murder and manslaughter, attempted murder, assault and battery and the aggravated forms of assault and battery.* His intentional infliction of (or, if he misses, his attempt to inflict) physical harm upon the other, or his threat to inflict such harm, is said to be justified when he acts in proper self-defense, so that he is not guilty of any crime." (Footnote omitted) (Emphasis supplied).

Statutory maiming, under Article 27, § 385, (or, for that matter, common law mayhem) is also an aggravated assault. An exculpation with respect to an underlying assault, by necessary implication, would be a defense to the aggravated form of the crime as well. With respect to mayhem statutes generally (embracing both the common law felony and its statutory extensions), *LaFave & Scott, supra*, § 7.17, at 699, has stated:

> "It is a defense to mayhem that the defendant's conduct which causes the victim's maiming injury is done in necessary self-defense against an attack which threatens death or serious bodily injury." (Footnote omitted).

The instruction should have been given in this case with respect to all charges.

### Failure to Instruct on Self–Defense Not Harmless Error

The State mounts an alternative argument that, even if the failure to instruct on self-defense with respect to

the other charges was error, the error was harmless. Its theory is that the jury considered the self-defense issue in the context of attempted murder and rejected it, clearly implying that they similarly would have rejected it with respect to the other charges as well. The State argues in its brief:

"Because the jurors were properly instructed on self-defense ...as [it] applied to the attempted murder charges, and because the jurors nevertheless found Bryant guilty of attempted first-degree murder, it is clear that had they been given Bryant's requested instruction as to the other charges, their verdict would have been the same. *See Dorsey v. State*, 276 Md. 638, 659 (1976) (if there is no reasonable possibility that the error contributed to the guilty verdict, it is harmless)."

Were this a case in which a single blow had been struck or a single shot had been fired, there would be much logical force in the State's argument. This is not, however, such a case. The violent and bloody fight between the appellant and Upshaw, regardless of who was the initial aggressor, stretched out over considerable time and considerable distance. It involved three or four distinct sub-episodes and resulted in over forty stab wounds being inflicted.

As the State acknowledges, the statutory maiming charge was based upon the appellant's stabbing of Upshaw in the right eye, causing permanent blindness. According to the appellant's version of events, this stabbing occurred at about the time that Upshaw jumped on the appellant and began choking him. According to his version, that blow could well have been in self-defense. The State's theory with respect to the attempted first-degree murder charge, on the other hand, was based upon the appellant's repeated stabbings of Upshaw and his leaving him apparently for dead.

In a case such as this, the jury, had it chosen to believe the appellant's story in part, might have concluded that the appellant was acting in self-defense when he stabbed Upshaw in the eye and when he assaulted Upshaw with intent

to disable him. The same jury, however, with equal plausibility, could have rejected as totally unreasonable any self-defense justification for the repeated and murderous stabbings of Upshaw once Upshaw was lying prostrate and helpless in the creek bed.

Because the thirty-seventh and thirty-eighth blows, for example, might not have been grounded in reasonable self-defense does not compel a finding that the seventh or eighth blows might not have been. A critical element in self-defense law is the possible excessiveness of what begins as a legitimate response. Clearly, this was a factual question which, with proper instructions, should have been submitted to the jury.

### *Intoxication and Specific Intent*

■ The law is well settled that voluntary intoxication may be a defense to a crime requiring specific intent but will never be a defense to a mere general intent crime. *State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973). *And see* the very full and excellent analysis of voluntary intoxication and specific intent by Judge Eldridge in *Shell v. State*, 307 Md. 46, 512 A.2d 358 (1986).

In this case, as we have already discussed, there was ample evidence of voluntary intoxication on the appellant's part through both drugs and alcohol. The contention, of course, has no merit with respect to the assault and battery charge because that is a mere general intent crime. Voluntary intoxication is never an excuse with respect to such a crime.

Assault with intent to maim, disfigure, or disable, on the other hand, is, by statutory definition, a crime requiring a specific intent. Article 27, § 386 provides, *inter alia*, that one is guilty of the crime if he "shall assault or beat any person, *with intent to maim, disfigure or disable such person ...*" (Emphasis supplied). Judge Wilner discussed the nuances of this particular specific intent at great length

in *Jenkins v. State*, 59 Md.App. 612, 617–620, 477 A.2d 791 (1984).

Statutory maiming, under Article 27, § 385, is also indisputably a specific intent crime. It explicitly spells out the required *mens rea* that the maiming act shall be done "of malice aforethought, with intention in so doing to mark or disfigure such person ..."

With respect to both statutory maiming and assault with intent to disable, the appellant was entitled to an instruction on voluntary intoxication. It was error not to have given that requested instruction.

### Failure to Instruct on Voluntary Intoxication Not Harmless Error

■ Once again, the State makes the alternative argument that the error, if any, was harmless. The argument is that, since the jury found that the appellant was not too intoxicated to form a specific intent to kill, it thereby necessarily found that he was sober enough to form any specific intent to do anything.

The flaw in the State's argument is that it treats specific intent as a monolithic abstraction rather than as an umbrella term embracing many different specific intents. It presupposes that on the sober-drunk continuum, there is some precise point of intoxication, where all capacity to form any kind of a specific intent dissolves into an intoxicated blur.

To understand the essential pluralism of the phenomenon, we need to understand that a culprit who does a generally intended immediate act with a specific intent is one who has in mind that his immediate act will bring about some desired end or more remote purpose. In *Smith v. State*, 41 Md.App. 277, 305, 398 A.2d 426 (1979), we discussed these general characteristics:

"A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate

act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods."

The multiplicity of possible ends or purposes was discussed, at 41 Md.App. at 306, 398 A.2d 426:

"We may understand the intentional or deliberate killing the better when we appreciate that the species 'specific intent to kill' is but a member of the broader genus 'specific intent.' The larger class 'specific intent' includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the 'specific intent to inflict grievous bodily harm' variety of murder. Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result."

Specific intents come in all shapes and sizes. Some specifically intended purposes are very simple; others may be far more complex. Some specifically intended results will be immediate; others may be far more remote. It seems but a psychological truism that as a defendant slowly sinks into a drunken trance, he may lose hold of his more remote and complex purposes well before he loses sight of his simpler and more immediate purposes.

Different specific intents will fade at different rates. In assault with intent to rape, for instance, the gap between the immediate act and the intended purpose may be so slight as to be little more than theoretical. The generally

intended pushing of the wrong computer key, on the other hand, with the design to set in motion a series of events that will ultimately lead to the fraudulent transfer of funds involves a far more complex understanding of the cause-and-effect relationship. That the specific intent to do the latter could dissolve into an alcoholically induced haze more quickly than the former is but a truism.

In any event, it seems clear that the possible effect of voluntary intoxication upon a particular specific intent is quintessentially a question of fact for the jury, properly instructed.

### Assault With Intent to Murder Versus Attempted Murder

■ After the close of the entire case, the State entered a *nolle pros* as to the count charging assault with intent to murder. The count charging attempted murder in the first degree was submitted to the jury. The appellant objected on the basis of *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989). The objection was overruled. The appellant now claims that this removing from the consideration of the jury of a lesser included count is in violation of *Hook v. State, supra*, and *Fairbanks v. State*, 318 Md. 22, 566 A.2d 764 (1989).

The short answer to the contention is that the two crimes of 1) assault with intent to murder and 2) attempted murder in the first degree are not "the same offense" within the contemplation of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and *Newton v. State*, 280 Md. 260, 373 A.2d 262 (1977). Each possesses an element not possessed by the other and neither, therefore, is a lesser included offense within the other. This was the square holding of *State v. Holmes*, 310 Md. 260, 528 A.2d 1279 (1987). In the related context of comparing attempted rape with assault with intent to rape, we made the general observation, applicable here as well, in *Gray v. State*, 43 Md.App. 238, 241, 403 A.2d 853 (1979):

"For inchoate, not fully-consummated crime, society has long had available in its arsenal both the statutory offense of 'assault with intent to ...' and the common law offense of criminal attempt. Although these two offenses have a significant overlap, they are nonetheless distinct and each addresses certain pockets of inchoate criminal activity not covered by the other." (Footnote omitted).

We see no error.

### Allegedly Inflammatory Photographs

The appellant contends that the trial judge abused his discretion in admitting two black and white photographs showing the victim's blood-stained clothing. In view of the fact that he had been willing to stipulate that it was he who had stabbed the victim, he claims that the photographs depicting a significant quantity of blood served no purpose other than to inflame the jury. We see no merit in the contention. We note initially that the photographs were not in color and showed only clothing, not the victim himself. The decision of whether to admit photographs is one entrusted to the sound discretion of the trial court and will not be disturbed unless the photographs are "likely to so distort the jury's deliberations that [their] admission was 'plainly arbitrary.'" *Bedford v. State,* 317 Md. 659, 676, 566 A.2d 111 (1989) *quoting, Mills v. State,* 310 Md. 33, 44, 527 A.2d 3 (1987). In the *Bedford v. State* case, incidentally, nine color photographs of the victim's body were held to have been properly admitted.

This was a case, of course, where the jury was being asked to consider whether the attempted murder was in the first degree. With respect to the value of photographs in making that determination, *Johnson v. State,* 303 Md. 487, 502, 495 A.2d 1 (1985), observed:

"On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the

crime—a circumstance of much import where the fact-finder must determine the degree of murder."

We see no remote abuse of discretion here.

*Credit for Pretrial Time Served*

The appellant contends that under the provisions of Md. Ann.Code art. 27, § 638C (1987), he should have received credit, at the time of his sentencing, for the 221 days of incarceration between his arrest and his sentencing. The transcript made no mention of the appellant's receiving any credit for time already served. The docket entry stated: "Sentence to commence as of September 6, 1989. ((0) days credit given)." The State acknowledges that the appellant is correct in this contention and agrees that the sentence must be vacated and the case remanded for resentencing.

JUDGMENT OF CONVICTION FOR ATTEMPTED MURDER IN THE FIRST DEGREE AFFIRMED; CONVICTIONS FOR STATUTORY MAIMING, ASSAULT WITH INTENT TO DISABLE AND ASSAULT AND BATTERY REVERSED AND REMANDED FOR NEW TRIAL; SENTENCE FOR ATTEMPTED MURDER IN THE FIRST DEGREE VACATED AND REMANDED FOR RESENTENCING; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.