**Bynes v. State, No. 1318 of the 2017 Term, Opinion by Moylan J.**

**HEADNOTE:**

SECOND-DEGREE ASSAULT – SELF-DEFENSE AT THE NON-DEADLY LEVEL – THE ONSET OF A QUARREL – THE APPELLANT REACTS – SELF-DEFENSE HAS A CRITICAL SUBJECTIVE COMPONENT – APPELLANT'S RESPONSE TO BEING SLAPPED – THE EVIDENCE DID NOT GENERATE THE ISSUE – THE BEST SOURCE OF EXCULPATORY EVIDENCE WAS SILENT – THE APPELLANT DOES NOT SAY OTHERWISE – THE DECLARATION OF A MISTRIAL: A RARE, RARE REMEDY

Circuit Court for Prince George's County
Case No. CJ170530

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1318

September Term, 2017

_____

DONOVAN BYNES

v.

STATE OF MARYLAND

_____

Meredith,
Leahy,
Moylan, Charles E., Jr.
        (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: June 4, 2018

This was a case of belligerent pillow talk run amok. After seven or eight years of presumptive tranquility, which produced two children, a garden variety domestic dispute between the appellant, Donovan Bynes, and the mother of his children, Ruth Chavez, spun hopelessly out of control. In the Circuit Court for Prince George's County, a jury, presided over by Judge Sean D. Wallace, convicted the appellant of an assault in the second degree on Ms. Chavez at their pre-marital apartment at 11246 Evans Trail on July 31, 2016. The couple had been living together, with their children, at that apartment since March or April of 2016. They were engaged to be married. The appellant was sentenced to a term of imprisonment of ten years, with all but three years suspended.

## The Contentions

1. The appellant initially contends that Judge Wallace erroneously declined to instruct the jury on his claim of self-defense.

2. The appellant secondly contends that Judge Wallace erroneously failed to declare a mistrial.

## Self-Defense At The Non-Deadly Level

The caselaw is so bloated with claims of self-defense in the more dramatic context of homicide law or other cases involving deadly force that it has been largely overlooked that the common law defense of self-defense also enjoys an independent vitality at the non-homicidal and non-deadly level. As this Court first pointed out in Bryant v. State, 83 Md. App. 237, 245, 574 A.2d 29 (1990):

> Although discussions of self-defense in the context of homicide cases understandably have dominated the field, the simple and frequently neglected larger truth is that the defense of self-defense applies to assaultive crimes generally.

(Emphasis supplied). <u>See also Jones v. State</u>, 357 Md. 408, 424, 745 A.2d 396 (2000) ("Aside from its application to a charge of murder, Maryland appellate courts have applied common law self-defense to other assaultive crimes."); <u>Bussie v. State</u>, 115 Md. App. 324, 345, 693 A.2d 49 (1997).

In <u>Jones v. State</u>, 357 Md. at 422, Judge Harrell wrote for the Court of Appeals in laying out the elements of self-defense at the level not involving deadly force.

(1) the defendant actually believed that he or she was in immediate or imminent danger of bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant must not have been the aggressor or provoked the conflict; and

(4) the defendant used no more force than was reasonably necessary to defend himself or herself in light of the threatened or actual harm.

This was a two-witness trial. Ruth Chavez gave her version of the events of the evening of July 31, 2016. The appellant gave his version. The two versions differed dramatically. The jury obviously believed Ruth Chavez's version. Because the appellant does not challenge the legal sufficiency of the evidence to support his conviction for assault, Ruth Chavez's version of the incident is of small consequence to us on this appeal. The issue of whether the evidence was enough to generate a jury instruction on self-defense depends, in the circumstances of this case, largely on the appellant's version of the critical events. Based on the appellant's testimony, which, in this case, portrayed the facts in the light most favorable to his claim of self-defense, we agree with Judge Wallace that the self-defense instruction was not "generated by the evidence in this case."

### The Onset Of A Quarrel

Both parties agreed that their relationship had lasted for seven or eight years and that they had had two children together. They agreed that they had moved into the Evans Trail apartment in March or April of 2016 and that they were engaged to be married.

According to the appellant, the whole family had gone out to dinner together at the Olive Garden on the evening of July 31, 2016. On the way home, they stopped to pick up a bottle of wine. The appellant testified that he and Ms. Chavez "had been having a good day," but that, because of recent quarrels, he was seriously questioning the future of their relationship.

The appellant further testified that, as he and Ms. Chavez lay down in bed for the night, she asked him to get the wine and to turn the lights out so that they could "have sex." He declined, telling her that he did not want to be sexually intimate with her anymore. Understandably, she reacted angrily, accusing him of "cheating" on her and demanding to know with whom he had been cheating. According to the appellant, Ms. Chavez grabbed his phone and threw it at him, breaking it against the wall. He told her that that sort of behavior was why he no longer wanted to be with her. In any event, the phone did not hit the appellant and he never intimated that he was afraid of being hit by it as a projectile.

Up until the throwing of the phone, the two versions of events are not that far apart. According to Ms. Chavez, as the two prepared to go to bed for the night, she confided that she was pregnant with their third child. When he then told her that the child was not his and that she should be careful about whom she slept with, she became understandably upset. She stormed from the room but then returned to confront the appellant about what

3

he had said to her. The appellant, unresponsive, was on his phone. That further angered Ms. Chavez and she grabbed the phone and threw it against the wall.

It will be noted that, as of this point, the appellant has not exerted any force or physically done anything that could qualify as a self-defensive action or maneuver.

## The Appellant Reacts

The appellant testified that after Ms. Chavez threw the phone against the wall, she left the room and went to the children's room. When she subsequently reentered the room, she slapped him across the face, leaving a scratch on his face from the corner of his eye to the bottom of this nose. Even to that point, the appellant has not acknowledged the use of any force against Ms. Chavez. His reaction was simply to order her to leave the house.

> [DEFENSE COUNSEL]: Let's move forward in time a little bit. You said this slap happened. What happened next?
>
> [WITNESS]: When she slapped me, I told her you got to get the fuck out of my house now. I'm not going to keep doing this bullshit. Get the fuck out. She was in her underwear and shirt. She wasn't trying to leave. She said no, this is my house, too. Tell me who she is. That has nothing to do with you. Cheating on you. Get the fuck out.
>
> She's out the room near the bathroom, going towards the kitchen. She's taking her sweet time talking shit. I don't have to get out this is my house, too. Tell me who the fuck she is.
>
> We're still between the bathroom and the kids' room. I go to the room, grab some pants and shoes. I go to the front door and throw it outside.
>
> [DEFENSE COUNSEL]: Whose pants and shoes?
>
> [WITNESS]: Her pants and shoes.
>
> [DEFENSE COUNSEL]: Not yours?

4

[WITNESS]: Right. <u>As I'm walking to the front door with her stuff, she's already following me.</u>

(Emphasis supplied).

## Self-Defense Has A Critical Subjective Component

To that point, there had been no physical use of force by the appellant against Ms. Chavez to which the defense of self-defense could possibly apply, at least as far as testified to by the appellant himself. Regardless of which party produces the evidence, the evidence must show some use of force against the victim. There is a thing, a quiddity, that must be the subject of the justification. Ordinarily, the party requesting the instruction would himself produce the evidence to generate the issue. That party could, however, rely on the opposing party to produce some or all of that generating evidence for him. Someone, however, must produce evidence that the appellant used some force against his victim. We cannot prove the justification for "something" unless we have that "something" that needs to be justified. What is the evidence that the appellant did "something" to Ms. Chavez?

With respect to the appellant's use of force against Ms. Chavez, the force that appellant claims was exerted in self-defense, might Ms. Chavez's testimony itself help generate that element of the total incident? To what extent might Ms. Chavez's testimony fill that gap as to the underlying assault itself? The answer is that it could supply that necessary component of the self-defense scenario, the physical assault itself. She did, to be sure, testify that he hit her twice in the face with his fist. In this case, her testimony could have supplied the physical component of a self-defense scenario, to wit, the <u>corpus delicti</u>

of the assault itself. Evidence of a single component of self-defense, however, would not be enough, in and of itself, to generate a jury instruction on self-defense.

A self-defense trial scenario requires more than physical action, action that could be depicted by a silent movie. There is an indispensable mental component as well as the required physical component. The testimony of the ostensible assault victim could, even as a functioning camera might, establish, for the benefit of one claiming self-defense, the antecedent facts that Buster Keaton was first punched and then furiously counterpunched. The testimony of the opposing party, however, could not establish, for Buster Keaton, Keaton's "actual belief that he was in imminent danger of being punched" as the motivation for his counterpunching. That is, generally speaking, something that he, and he alone, must do for himself. We need some evidence of what the defendant was thinking. Something subjective rather than merely objective. Whatever the silent movies might portend, a counterpunch is not self-defense per se. As of that moment in the appellant's trial narrative, there had been no suggestion that self-defense was even an issue in the case. The appellant had not testified to the use of any force that would require justification, a necessary antecedent to the justification itself.

### Appellant's Response To Being Slapped

As we turn our attention to the mental components of self-defense, we note that self-defense is one of a variety of possible responsive actions: retaliation, submission, flight, self-defense. The critical question in this case is that of how did this appellant respond to being slapped in the face. There is no suggestion that he struck back in self-defense. There is every indication that the appellant's reaction to having been slapped was retaliatory—to

6

order Ms. Chavez to get out of the house and, when she declined to leave voluntarily, to push her and her belongings out physically. The initial reaction to the slap was purely verbal and it was retaliatory. The appellant ordered Ms. Chavez to get out of the house.

> [WITNESS]: <u>When she slapped me, I told her you got to get the fuck out of my house now.</u> I'm not going to keep doing this bullshit. <u>Get the fuck out.</u>

(Emphasis supplied).

Ms. Chavez responded that she would not leave. The exchange, albeit very heated, remained exclusively verbal. The appellant testified:

> <u>She said no, this is my house, too.</u>
> . . . .
> She's out the room near the bathroom, going towards the kitchen. <u>She's taking her sweet time talking shit. I don't have to get out this is my house, too.</u>

(Emphasis supplied).

In the course of this angry exchange, the appellant and Ms. Chavez were not exchanging blows. Barbs, to be sure, but not blows. They were moving back and forth, between different rooms of the apartment. The appellant went into one of the rooms to grab some of Ms. Chavez's pants and shoes in order to throw them out the door of the apartment. The appellant testified:

> We're still between the bathroom and the kids' room. I go to the room, grab some pants and shoes. I go to the front door and throw it outside.
> . . . .
> As I'm walking to the front door with her stuff, she's already following me.

It was only as the appellant and Ms. Chavez were then standing at the front door, with him throwing her pants and shoes into the hallway and with her standing there in her underwear, that the appellant, by his own admission, laid hands on her for the first time,

7

"She's still talking shit, so I grabbed her." (Emphasis supplied). This was the appellant's first acknowledgement of touching Ms. Chavez. He further explained what "grabbing her" consisted of:

> [DEFENSE COUNSEL]: How did you grab her?
>
> [WITNESS]: I grabbed her by her arms.
>
> [DEFENSE COUNSEL]: With your hands?
>
> [WITNESS]: Yes. I didn't bear hug her or anything. I told you get the fuck out. She's holding the door. I opened it and was able to get her out.

(Emphasis supplied).

Most significantly, the appellant, on cross-examination, was asked to explain precisely what his motivation was for grabbing Ms. Chavez's arms and pushing her out the door. In no sense was his motivation self-defensive. It was in every sense retaliatory. There was no suggestion of anything but retaliation.

> [DEFENSE COUNSEL]: Why would you do that?
>
> [WITNESS]: One, I had just gotten back in the house from being kicked out for getting a job that she didn't like.
> . . . .
> [WITNESS]: Two, because she slapped me. You can't do that. You can't slap me and expect to still be here with me after everything we've been through. That's not fair. I didn't know she was pregnant until I read the statement. I didn't know anything about Ms. Chavez being pregnant until I read the police report. I didn't know she had a kid in her stomach. She never told me anything like that. We got two kids of our own. We were on the verge to do a lot of great stuff. For her to stand here and say she told me she was pregnant with my child, that's not fair at all. I didn't know nothing about that.

(Emphasis supplied). There is no inkling here of self-defense. The appellant was not afraid; he was offended.

8

## The Evidence Did Not Generate The Issue

A legal issue is an appropriate subject for a jury instruction if the evidence in the case has generated such an issue. In a criminal case in which a defendant is relying upon a claim of self-defense, a defendant is entitled to have the jury instructed on the law of self-defense if, but only if, the trial evidence has fairly generated self-defense as an issue. As Chief Judge Krauser explained for this Court in Dashiell v. State, 214 Md. App. 684, 696, 78 A.3d 916 (2013):

> "If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden."

> In State v. Faulkner, 301 Md. 482, 500, 483 A.2d 759 (1984), the Court of Appeals

emphatically held:

> [W]hen evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense.

(Emphasis supplied; footnote omitted). See also Simmons v. State, 313 Md. 33, 39–40, 542 A.2d 1258 (1988); Dykes v. State, 319 Md. 206, 215, 571 A.2d 1251 (1990); Dishman v. State, 352 Md. 279, 292–93, 721 A.2d 699 (1998); Bazzle v. State, 426 Md. 541, 550, 45 A.3d 166 (2012).

The element of self-defense that concerns us on this contention is the first of self-defense's absolute requirements, the prerequisite that **THE DEFENDANT ACTUALLY BELIEVED THAT HE WAS IN IMMEDIATE OR IMMINENT DANGER OF BODILY HARM.**

The evidence, moreover, must be generated not simply with respect to self-defense generally, but with respect to each of its constituent components specifically. In Marquardt v. State, 164 Md. App. 95, 131, 882 A.2d 900, cert. denied, 390 Md. 91, 887 A.2d 656 (2005), Judge Kenney wrote for this Court:

> There must be "some evidence," to support each element of the defense's legal theory before the requested instruction is warranted.

(Emphasis supplied). See also Cantine v. State, 160 Md. App. 391, 410–11, 864 A.2d 226 (2004), cert. denied, 386 Md. 181, 872 A.2d 46 (2005); Holt v. State, ___ Md. App. ___, ___, 182 A.3d 322 (2018).

### The Best Source Of Exculpatory Evidence Was Silent

No suggestion of self-defense ever reared its head in the course of the trial of this case. The most likely source of the appellant's "actual belief that he was in immediate or imminent danger of bodily harm" would have been, in this case, the appellant himself. Albeit testifying extensively in other regards, he was on this subject absolutely and indisputably silent. Ms. Chavez's testimony, moreover, did not fill this evidentiary gap for the appellant. As Judge Hollander expounded on the utter absence of such evidence in Thomas v. State, 143 Md. App. 97, 117–18, 792 A.2d 368, cert. denied, 369 Md. 573, 801 A.2d 1033 (2002):

> Significantly, appellant never expressed fear for his own safety . . . . It follows that the trial court properly concluded that the evidence did not establish that appellant believed that the use of force was necessary to prevent imminent death or serious bodily harm to himself . . . . Therefore, even if appellant had preserved his claim as to the jury instructions, the court did not err in declining to give the requested instructions.

(Emphasis supplied).

10

The Court of Appeals spoke to the same effect in <u>State v. Martin</u>, 329 Md. 351, 362–63, 619 A.2d 992 (1993):

> <u>When the issue is whether self-defense</u> or imperfect self-defense <u>has been generated, determining whether there is evidence in the record pertaining to the defendant's mental state at the time of the incident is critical. Only if the record reflects</u>, from whatever source, <u>that</u>, at that time, <u>the defendant subjectively believed that he</u> or she <u>was in imminent danger</u> of death or great bodily harm <u>could the issue be generated.</u>

(Emphasis supplied).

Judge Wallace declined to instruct the jury on self-defense, ruling that the evidence in the case had failed to generate the issue as one legitimately before the jury. We affirm that ruling as having been absolutely correct. It may have been that the evidence failed to generate a self-defense issue with respect to various other components of self-defense. It is only necessary, however, that we focus on one of them, the requirement that the appellant, subjectively, had "actually believed that he was in immediate or imminent danger of bodily harm." The appellant himself never testified to any such actual or subjective belief on his part. Ms. Chavez offered no testimony that suggested that the appellant had an actual and subjective belief that he was in immediate or imminent danger of bodily harm. Without that necessary mental component, there was no issue generated as to self-defense.

## The Appellant Does Not Say Otherwise

Ironically, the appellant seems, implicitly at least, to agree with our holding in this regard. The heart of the present appeal, eleven full pages of the appellant's brief, is focused on Judge Wallace's declining to give the appellant's requested instruction on self-defense.

11

Six of those eleven pages are focused on the threshold issue of whether this contention was ever preserved for appellate review.

In terms of preservation, the appellant acknowledges that he did not literally comply with the requirement of Maryland Rule 4–325(e) because he failed to "object[] on the record promptly after the court instruct[ed] the jury." The appellant strenuously argues, however, that he was in substantial compliance. The State insists otherwise. The issue of substantial compliance in this case is a close one over which the parties might haggle interminably. We find it unnecessary to referee such wrangling, however, because of our overarching conclusion that the appellant's contention fails on the merits, rendering its preservation a moot point.

Five of the eleven pages of the appellant's brief are dedicated to the merits of whether the self-defense instruction was generated by the evidence. On the merits, there was a full discussion by the appellant of the fact that the requested instruction was a correct statement of the law and that the issue of self-defense was not covered elsewhere in the jury instructions actually given. There was never any quarrel in either of these regards.

The appellant then takes several pages to tell us that we should examine the evidence in the light most favorable to the appellant. (We have, and so did Judge Wallace.) Interspersed is a discussion of the fact that the requirement to generate "some evidence" is only a requirement to produce a minimal amount of evidence and not a lot. Again, the argument was not yet zeroing in on the obviously critical issue in this case.

In turning finally to the "four elements of self-defense," the appellant happily details the actual evidence in arguing that Ms. Chavez, and not he, was the initial aggressor. He

argues at some length that his act of pushing Ms. Chavez out of the house would not have been unreasonably excessive in response to her attack of him.

It is only when turning to the required mental components of self-defense, the requirement that the defendant "actually believed that he was in immediate or imminent danger of bodily harm," and the attendant component that such a belief be reasonable, that the appellant's support in the evidence becomes very tenuous. Both of these components of self-defense are joined together in a single compound sentence.

> The jury could have found [1.] that Mr. Bynes had reasonable grounds to fear imminent or immediate threat of further harm from Ms. Chavez, and [2.] that in fact he did so believe, as there was testimony that she initiated two separate, escalating confrontations with him.

(Emphasis supplied).

The construction of that sentence is ingeniously clever. The dominant portion of that compound sentence—the assertion that **IF THE APPELLANT ACTUALLY HAD SUCH A BELIEF, THE BELIEF WOULD HAVE BEEN REASONABLE**—is legitimately argued. The possible basis for such a reasonable belief was arguably supported by evidence and was spelled out in the final clause: "as there was testimony that she initiated two separate, escalating confrontations with him." That part of the compound sentence would read:

> The jury could have found that Mr. Bynes had reasonable grounds to fear imminent or immediate threat of further harm from Ms. Chavez . . . as there was testimony that she initiated two separate, escalating confrontations with him.

That part of the ingenious compound sentence, however, concerned only the second component of self-defense, the reasonableness of such a belief **IF SUCH A BELIEF**

13

**EXISTED**. Ms. Chavez's physical actions, fully testified to by the appellant, could arguably have made the appellant's belief reasonable. None of this, however, is evidence as to whether the appellant actually had such a subjective belief that he was in danger.

What then, in the last analysis, is the sum total of the evidence to support the necessary showing that the appellant had the "actual belief that he was in immediate or imminent danger of bodily harm"? In eleven pages of appellate argument, the closest the appellant can come to asserting that there was any evidence to support such a belief is a cleverly hidden stowaway in the rump end of that deviously clever compound sentence. That rump end would read:

> The jury could have found that . . . in fact he did so believe, as there was testimony that she initiated two separate, escalating confrontations with him.

(Emphasis supplied).

On close examination, moreover, what seems to be a statement about the appellant's actual belief does not even hold up as such a statement. The subject of the secondary sentence fragment is not "The appellant actually believed," but "The jury could have found." Ms. Chavez's "two separate, escalating confrontations" might support the jury's finding as to reasonableness, but it would do nothing to establish the appellant's actual belief. That such a belief, **IF IT EXISTED**, could have been found by the jury to have been a reasonable belief, does not establish that the belief actually existed.

The appellant does not argue that, as a matter of law, some direct evidence from the mouth or from the pen of the appellant is not essential to establish his subjective belief. The appellant, in the last analysis, does not point to a shred of evidence that he actually had

14

such a belief. The appellant can neither point to any actual evidence nor argue that such actual evidence is unnecessary. We agree with the appellant that "some evidence" does not mean "a lot," but it does mean "some." In this case, there was not "any."

## The Declaration Of A Mistrial:
## A Rare, Rare Remedy

The appellant's second contention will not detain us long. He claims that Judge Wallace twice abused his discretion by denying the defense requests for a mistrial. Each of the incidents was as fleeting as it was trivial, but we shall nonetheless indulge the appellant by memorializing them.

On the first occasion, Ms. Chavez was asked on direct examination about the manner in which the appellant was trying to push her out of the apartment. She responded:

> He started to push me. And I ended up in [sic] kitchen pantry. At that time, I was trying to call the police, but my emergency phone that I had bought, because of previous incidents –
>
> [DEFENSE]: Objection.
>
> THE COURT: Sustained.
>
> [DEFENSE]: Curative[?]
>
> THE COURT: Just disregard that.

(Emphasis supplied). The incident was over and the direct examination moved on, until defense counsel elected to highlight it.

> [DEFENSE]: Judge, can we approach?
>
> (Counsel and defendant approached the bench.)

15

[DEFENSE]: Judge, I think this was intentional. This came out at the first trial the exact same way. It was sustained at the first trial. I would move to dismiss because of that question.

THE COURT: And . . .

[DEFENSE]: I think it's so prejudicial that it was done intentionally, number 1; and, number 2, cannot be undone by the jury.
THE COURT: So what do you want me to do?

[DEFENSE]: I want you to dismiss the case.

THE COURT: Denied.

[DEFENSE]: I would ask that you declare a mistrial.

THE COURT: Denied.

[DEFENSE]: I would ask that you give a curative instruction.

THE COURT: I just did.

(Emphasis supplied).

At another point, on cross-examination, the defense sought to impeach Ms. Chavez with the fact that she had failed to include certain details when filing her statement associated with her application for a statement of charges. The implication was that any factual details that Ms. Chavez failed to include in her written application were facts that never happened. On redirect examination, the State sought to rehabilitate Ms. Chavez by showing her lack of expertise in preparing and filing court papers.

[THE STATE]: Are you an attorney?

[WITNESS]: No.

[THE STATE]: Have you filed charges before?

[WITNESS]: Against him, yes.

16

[DEFENSE]: <u>Objection.</u> Your Honor, can we approach?

THE COURT: <u>Objection sustained. Disregard that.</u>

(Emphasis supplied).

Again, everyone approached the bench for a formal ruling.

(Counsel and defendant approached the bench.)

[DEFENSE]: Judge, I think that response was calculated. I think it was far more prejudicial than probative. I think that was inappropriate, and <u>I move for mistrial.</u> I think it's inappropriate to know about any prior charges.

THE COURT: <u>Denied.</u>

(Emphasis supplied).

The appellant proceeds to argue before us the merits of Judge Wallace's rulings on the motions for a mistrial as if those rulings were before us for a <u>de novo</u> determination on their direct merits. Such, of course, is not the case. We are not ruling directly on the merits of the mistrial motions. We are one step removed. We are reviewing the discretionary exercise by Judge Wallace as he ruled on the merits. Those are two very different standards of review and that difference is the most critical factor in our resolution of this contention.

Judge Raker (on special assignment) wrote for this Court in <u>Fleming v. State</u>, 194 Md. App. 76, 94, 1 A.3d 572 (2010), with respect to both allocating the burden of proof and identifying the standard of appellate review:

> The defendant bears the burden of showing that the prejudice arising from the trial court's error demands the declaration of a mistrial. <u>This Court reviews a trial court's decision to decline to grant a mistrial under an abuse of discretion standard.</u>

17

(Emphasis supplied; citations omitted). <u>See also Walker v. State</u>, 373 Md. 360, 378, 818 A.2d 1078 (2003); <u>Drake and Charles v. State</u>, 186 Md. App. 570, 587, 975 A.2d 204 (2009) ("We review a trial court's denial of a motion for mistrial for abuse of discretion."), <u>rev'd on other grounds</u>, 414 Md. 726, 997 A.2d 154 (2010).

The Maryland caselaw has repeatedly made clear the reason for this heavy deference to the decision of the trial judge.

> The trial judge is in the best position to decide whether the motion for a mistrial should be granted. Accordingly, <u>we will not interfere with the trial judge's decision unless appellant can show that there has been real and substantial prejudice to his case.</u>

<u>Wilson v. State</u>, 148 Md. App. 601, 666, 814 A.2d 1 (2002) (emphasis supplied; citations omitted), <u>cert. denied</u>, 374 Md. 84, 821 A.2d 371 (2003).

In <u>Hunt v. State</u>, 321 Md. 387, 422, 583 A.2d 218 (1990), the Court of Appeals carefully explained that it is because the trial judge had observed first hand at the trial the impressions made by the witnesses, the reactions of the jurors—that the trial judge had his thumb on the pulse of the trial—that he has a sense that no cold record can communicate—as to the impact on a trial of a passing incident of possible error.

> This Court has recognized that <u>granting a motion for a mistrial lies within the discretion of the trial judge. The trial judge</u>, who hears the entire case and can weigh the danger of prejudice arising from improper testimony, <u>is in the best position to determine if the extraordinary remedy of a mistrial is appropriate.</u> We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion.

(Emphasis supplied; citations omitted). <u>See also Braxton v. State</u>, 123 Md. App. 599, 667, 720 A.2d 27 (1998) ("Abuse of discretion will not be found unless it is clear that there has been 'egregious prejudice' to the defendant.").

As this Court summed up this small corner of the law in <u>Molter v. State</u>, 201 Md. App. 155, 178, 28 A.3d 797 (2011):

> [T]he granting of <u>a mistrial is an extraordinary remedy</u> that <u>should only be resorted to under the most compelling of circumstances.</u>

(Emphasis supplied).

There were no such compelling or extraordinary circumstances here. Not only every hard-fought case but every even modestly contested case is permeated with glitches and errors. If every modest error could abort a trial, it would be a rare, rare case that would ever make it to the rendering of a verdict. It is for this reason that the reviewing court relies on the trial judge—the umpire on the field—to "sense" the difference, in a highly particularized context, between the extraordinary error and the merely ordinary error, between egregious error and more modest error. Just as the law must guard against error, it must also guard against overreaction to error. Sometimes the courts would like to be able to say, "Oh, for Heaven's sake! Move on!"[1]

In this case, there were arguably two modest glitches. With respect to each, Judge Wallace sustained the appellant's objection and gave as much of a curative instruction as the glitch seemed to warrant. On this contention, however, the issue is not whether there

---

[1] There may be a more politically correct Latin version: <u>De minimis non curat lex</u>.

19

was an error or on how Judge Wallace ruled on the objections or on the curative instructions. The issue is whether there was an extraordinary necessity for the trial itself to have totally imploded by the declaration of a mistrial. The conclusion of the judge closest to the action was that there was nothing so egregious or so extraordinary as to call for so rare and so dire a result. We see no remote abuse of discretion in that decision. If, <u>arguendo</u>, the issue were before us <u>de novo</u>, we would reach exactly the same conclusion, but that, of course, is merely coincidental. What matters is not what we would have done. What matters is that Judge Wallace was entitled to do what he did.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**